DAVID M. LITTLE & another *vs.* JOHN M. LITTLE & others, executors.

Suffolk.   March 20, 21, 1894. — March 28, 1894.

Present: HOLMES, KNOWLTON, MORTON, LATHROP, & BARKER, JJ.

*Question of Executors' Compensation rendered Immaterial — Special Compensation of Trustee — Agreement among Beneficiaries — Executors acting as Trustees — Ratification — Capital and Income — Repairs and Improvements — Error of Accounting.*

The contention that executors are not entitled to compensation for the sale of real estate does not arise if the commission charged was, with other commissions, disallowed in the Probate Court, and a lump sum was allowed for their services, and the allowance was affirmed by a single justice of this court, no reason being shown why the sum so allowed was not a fair and reasonable compensation.

A will which contemplated the keeping of nearly the whole principal in the hands of trustees for a long period provided that one of the trustees, who had had the full management of the estate for some years in the testator's lifetime as his agent under salary, should continue such management, receiving compensation independent of the trustees' commissions at the same rate as his former salary. After the probate of the will an agreement by which this salary was reduced was made by all parties, two of whom afterwards contended that the payments of compensation on this account should be disallowed, because not justified by the will before the trustees were appointed by the Probate Court. *Held*, that it was the intention both of the testator and the parties to the agreement that there should be no interruption in the services to be rendered, and that the decree allowing the charges for this compensation was right.

The same persons were named by a will as executors and trustees, and all the property, real and personal, was devised to them. Without objection they qualified as executors only, and proceeded in the management of the estate as a whole, without objection or protest, distributing the income from time to time among the beneficiaries. Expenditures by them upon the real estate, in the nature partly of permanent improvements, and partly of repairs, were found to be wise, judicious, and necessary. So far as the expense of these charges was defrayed with the capital, two of the beneficiaries contended that they ought not to be allowed, because the executors had not been appointed trustees by the court. *Held*, that, although it would have been more regular for them to have qualified as trustees in the first instance, they were the persons to whom the property both real and personal was given by the will, and who had a right as trustees to make the expenditures; and that the objection was fully answered by the fact that since becoming trustees they had in that capacity adopted and ratified their acts as executors.

Where real property is left in trust to pay the income to one class, and the principal eventually to another class, the general rule is that repairs come out of income and substantial improvements out of capital, and there is no distinction that a line should be drawn at the death of the testator so that repairs then needed should be called improvements ; and if it is impossible for the executors acting as trustees to separate by items the amounts chargeable to reconstruction and the amounts chargeable to repairs, because the repairing was done in the course of reconstruction and by the same men at the same time, an apportionment by the executors of the expense of the work according to their best judgment, charging to income the expense of so much of the work as they considered repairs, and to capital so much of the work as they considered reconstruction, will not be disturbed by this court.

A testator gave his entire estate to trustees to pay over the net income to his six children, two of whom were two of the three executors and trustees. The first two accounts were allowed by the Probate Court without objection, after the publication of citations, and the third was assented to by four of the six beneficiaries, two of whom were executors and trustees, and objected to by two beneficiaries who are the appellants and contestants. The accounts were corrected by crediting to income and charging to capital a certain sum, and the contestants not only claimed two sixths of that sum, but contended that the remaining four sixths should be held by the trustees, so that the contestants would get two sixths of the income of it, the other four beneficiaries being entitled to no part of it, as they had assented to the accounts. *Held*, that the contention was untenable, as the error was not one of administration but of accounting.

APPEAL, by Grace A. Oliver and David M. Little, two of the children and legatees under the will of James L. Little, from a decree of the Probate Court allowing the third and final account of the executors of said will.

Hearing before *Knowlton*, J., who confirmed the decree of the Probate Court, and reported the case, at the request of the appellants, for the determination of the full court, in substance as follows.

James L. Little died on June 19, 1889, leaving six children and an estate of about $2,500,000, invested about one half in real estate and one half in personal property, all of which after the payment of debts, which amounted to about $30,000, and defraying the cost of a monument, he gave to trustees to pay over the net income in equal shares to his six children. He appointed two of his sons, John M. Little and James M. Little, and James H. Beal, his executors and trustees, and they were appointed and qualified as executors on July 29, 1889, when the will was admitted to probate, but did not qualify as trustees until February 29, 1892. As executors they filed three accounts, the first covering the period from July 31, 1889, to July 1, 1890, the second the period from July 1, 1890, to July 1, 1891, and the third from July 1, 1891, to April 1, 1892. The first two accounts were allowed by the Probate Court without objection, after the publication of citations, and the third, which was assented to by all the beneficiaries except the appellants, was referred to Hon. John Lowell as auditor, it being agreed that the reference brought before him the first and second accounts so far as they could properly be opened to correct mistakes or errors therein.

The questions raised were as follows : —

1. The contestants contended that a commission of two and one half per cent on the price for which the testator's dwelling-house, No. 2 Commonwealth Avenue, Boston, was sold, should be disallowed.

The executors in their account charged a commission of two and one half per cent on the capital of the personal estate, including therein the proceeds of the sale of this dwelling-house. This sale was not made to pay debts or legacies, the debts being less than $30,000. The executors paid a commission of one per cent on the price to a broker for negotiating the sale. The

Probate Court disallowed the commission charging a percentage on the capital, and allowed in lieu thereof $24,000, the decree reciting that the "auditor's report be confirmed with the exception that in view of the yearly charges for clerk hire, office rent, etc. allowed in the first and second accounts, and asked for and allowed in this the third and final account, and taking into consideration all the circumstances of the case, it is further decreed that of the item for executors' fees of thirty-four thousand five hundred eighty-seven and $\frac{36}{100}$ dollars there be allowed only the sum of twenty-four thousand dollars, the same being a just and reasonable compensation for services of said executors." The only objection to the decree of the Probate Court allowing commissions was that there was included in the commission an allowance of two and one half per cent on the proceeds of this house. The presiding justice held that the allowance of compensation made by the Probate Court rendered this objection immaterial.

2. The contestants objected to the payments of salary to John M. Little, one of the executors, at $7,000 a year, from the death of the testator to February 29, 1892, when the trustees were qualified, $19,250, and contended that this charge to income should be disallowed.

The will contained this clause: "Inasmuch as my son John M. Little has for years had the charge and management of my property as my agent, I direct that he shall continue to have the active charge and management of the same, my real estate especially requiring constant care and supervision, and that he receive for such services compensation at the same rate as he shall have been receiving at the time of my death, this to be independent of the commissions to which my trustees are entitled."

The compensation which he was receiving at the time of the testator's death was $12,000.

Two days after the probate of the will, the children of the testator made an agreement by which, after reciting the above written provision of the will, John M. Little agreed to take and the others agreed that he should receive $7,000 a year as compensation for the active care and management of the property, subject to the control and supervision of the trustees, in addition to the commissions to which the trustees should be entitled, and

it was stipulated that in all accounts of the executors and trustees this amount should be allowed.

The auditor's report recited: "From the words, common to the will and the contract, that this compensation should be in addition to the commissions of the trustees, the contestants argue that John M. Little must qualify as trustee before he should draw any salary. He has had the active care and management of the property since the death of his father, and this is an executors' account, so that he is within the terms of the contract. He is also within its true meaning. Neither the will nor the contract makes Mr. Little's compensation to be dependent on his accepting the office of either executor or trustee; but the plain meaning is, that, if he shall continue to act as agent after the death of the testator, he shall have the stipulated compensation."

3. The executors qualified on July 29, 1889, and entered into possession of the whole estate, real as well as personal, not being appointed or qualifying as trustees until February 29, 1892, when they were ready to close their accounts as executors. Their petition for trusteeship was dated February 20, 1892. They kept but one set of books, in which they included the income and expenses of the real estate as well as of the personal property, and all the expenditures on the real estate. During the period of their executorship they expended a considerable amount of money in repairs and improvements of the real estate, charging improvements to capital, and repairs to income, in their accounts.

The executors charged themselves in their three accounts, not only with the personal estate and its income, but also with the income of the real estate, and credited themselves with the expenditures upon the real estate incurred in repairing, running, and improving it. In the third account they credited themselves with the balance of the personal estate as paid over to themselves as trustees. At the hearing before the auditor on the third account, the contestants for the first time objected to the executors including in the accounts the amount of money paid by them and charged to capital for improvements. It appeared that the contestants knew that the executors were receiving the rents of the real estate, and no objection was made to the payment by the executors of the running expenses of the real

estate, or of ordinary repairs, or of the net rents to the bene-
ficiaries.  David M. Little, one of the contestants, was absent in
Europe from October, 1889, to October, 1891.  There was no
evidence whether or not either of the contestants had actual
knowledge that when these expenditures for improvements were
being made the executors had not qualified and been appointed
trustees, or whether or not either of them had actual knowledge,
before the third account was brought to them for approval, that
they had charged these expenditures in their accounts as execu-
tors.  Neither of them appeared as a witness or was requested
to appear.  Before this account was filed, it was submitted to
the contestants and explained to them by John M. Little, and
neither of them objected to these expenditures being included.
There was no evidence to show that either of the contestants
had any experience in the making up of probate accounts, or
knowledge whether said charges were properly included in this
account or not.

The details and facts concerning these expenditures were testi-
fied to at great length before the auditor, and the contestants
contended that the wisdom, or judiciousness of the improvements
could not be inquired into in the hearing on the executors'
accounts because the expense of them was not properly charge-
able in said accounts; but the presiding justice ruled otherwise,
and found on the evidence that the improvements were wise and
judicious, and had increased the net rental of the property, of
which the beneficiaries had had the benefit.  This action of the
executors, and their method of keeping the accounts, had been
approved by the accountants acting as trustees.  The only objec-
tion made by the contestants to the charges was that the execu-
tors had no right to make the improvements.  The presiding
justice ruled that the including of these expenditures in these
accounts was justifiable under the circumstances.  If this ruling
was erroneous, the accounts were to be altered by crediting the
amounts standing in the accounts as charged to capital for addi-
tions to the real estate, as paid to the respondents in anticipation
of their appointment and qualification as trustees, and were to
be accounted for by them by similar entries in their accounts,
subject to the right of the contestants to object to the wisdom
and judiciousness of the expenditures.

4. Capital and income.  The auditor's report recited: " In the course of repairing and renovating the several tenements and buildings, large expenses were incurred.  They were entered in the first instance in the books of account against income, and at the end of each year, when the accounts were made up, a division was made between capital and income, as the trustees considered proper and just.  The contestants have examined John M. Little fully upon these items, which are numerous, and have made up a schedule showing how they consider that each item should be charged, whether to capital or to income.  Their view of the law is, that in a case of this kind, where a large property is left in trust to pay the income to one class, and the principal eventually to another class, equitable tenants for life are entitled to have the real estate left by the testator put into good repair, so as to be let to the best advantage, at the expense of the capital, and in that view they object to any of the repairs being charged to income, except what may be called current expenses after all repairs and renovations had once been made.  I consider the law to be otherwise.  While there may be no invariable rule upon the subject, the general principle is that repairs are to be made from income; and I have not seen the distinction taken that a line should be drawn at the death of the testator, so that repairs then needed should be called improvements.  Where the gross rents, as in this case, are above $100,000 a year, I am of opinion that repairs, though they may have been needed at and before the testator's death, are properly chargeable to the income, which is certainly benefited by keeping the buildings in good order, while the benefit to the inheritance is contingent and problematical.  A life tenant takes the property as he finds it. If he wants repairs he makes them.  He cannot require the remaindermen to do any part of them.  That the property is in trust makes no difference in the rights of the parties, though the trustees may have the right to make repairs and improvements if no one objects.  The law of Massachusetts permits the capital to be employed in substantial alterations and improvements if the inheritance appears to be benefited to the extent of the outlay.  If it were possible to ascertain how much in dollars and cents each class is benefited by what has been done, it would be easy to decide these matters.  In the absence of such even

approximate estimate, the rough and ready rule that repairs come out of income, and substantial improvements out of capital, furnishes as good a method as any I know. The simplest instances in which the foregoing question arises are the house 122 Marlborough Street, Boston, and the Evans House. The Marlborough Street house was let for ten years, of which eight had run at the death of the testator. When the two years were out, the trustees properly expended, in papering, painting, and entire replumbing, $2,972.29. These were clearly repairs, and, on my theory of the law, are rightly charged to income. In the Evans House (first account) a new elevator was needed to replace an old one, and was put in in September, 1889, at a cost of $1,240. In the second account there is charged for a new boiler needed to replace an old one, $1,577.61. These charges are properly made to income. The other cases are more complicated.

"Eliot and La Grange Streets. This property was bought at two different times, the two together forming a property extending through from one street to the other. The Eliot Street property was let for business, and the La Grange for boarding-houses. There were two old houses of no great value in the yard between the principal buildings. The alterations on Eliot Street were planned in the lifetime of the testator, and consisted of demolishing the two houses in the yard and extending the stores. Those on La Grange Street consisted of changing the lower stories into stores. The total cost of both was $11,886.46. Of this sum there was charged to capital in the first account $8,346.16, which is not objected to. Nothing was in this account charged to income. In the second account there was charged to capital $1,653.84. In the second account, to income $1,886.46, which it is contended should be charged to capital. The increase of rent warranted the expense. The charge to income appears to have been made on the estimate that it must have cost at least that sum to repair the house on La Grange Street for the uses to which it had before been put; and that the increase of permanent value, as shown by the city's assessment, was $10,000. The charge to income is exactly the excess of cost above $10,000. It will be seen that this apportionment is somewhat conventional. If such a mode of

division is admissible, I find that the income, which was much increased, was not charged too large a part of the cost.

"Hotel Pelham. Great changes and renovations were necessary in this large building. The total cost was, in round numbers, $46,000, of which was charged to income $30,000, and to capital $16,000. The circumstances of the case and the mode of division between capital and income is thus described by Beal, one of the trustees: 'The Pelham when we took it was an apartment house. . . . The position changed and ceased to be a desirable place of residence, and we began to have applications for offices. In order to meet those applications we had to refit the offices and change about. . . . In fact it had to be changed over, and we have been engaged in changing it over now for the last two or three years. . . . The heirs naturally wanted to get all the income they could get. I, on the other side, felt that I was called upon to keep that perfectly intact, to protect it, and not permit its being stripped. . . . To separate the absolutely necessary repairs to keep the building in shape from the changes which were being made to put it in condition, became a matter almost of judgment, and my feeling has been all along to keep the property up to the state in which a careful master should keep it up. If we erred at all, we erred in charging too much to principal, and not enough to income.'

"Acting upon the theory that the renewal of what was worn out should be charged to income, though this renewal was made in the course of permanent improvements, the trustees divided the expense according to their best judgment, charging the former to income and the latter to principal.

"Swampscott estate. The whole amount spent on this property was about $46,000, of which there was charged to capital about $28,500, and to income about $17,500. That is to say, the whole income for two years was taken for this purpose. Beal testified concerning this estate as follows: 'There is a great estate down there of over thirty acres; the very nature of the property requires a vast expenditure to keep it in order. The calls from the occupants are very numerous; . . . and the property itself was uncertain. Every spring we were in doubt whether we should get a tenant. Finally, a disposition of the property was made, cutting off a

part of the main house, putting it in condition for Arthur Little, who made us an offer . . . for five years, which we thought desirable. But to cut off a part of the main house, what should he do with it? Mr. John's mechanical ingenuity suggested we should take it as the basis of a new house near by, putting it between that and another house. That was done. Then the alteration of another house, called the Bates house, was done. Then still another house, and then stables had to be built. We had to charge capital with what we expended, and expected to get from that capital a small percentage in the development of the estate, which we have done, but if we had a larger income my advice and judgment would have been to charge income more rather than less, in order that we might keep the property as it should be.' He afterwards says that, excepting for some prospective value in the property, he should think the appraisement ($120,000) too high, and should have doubted the expediency of these expenditures. That the rents will give but a small percentage on the amount charged to capital. John M. Little, while agreeing with Beal, as I understand, that too much has not been charged to income, actually made up the division by charging new construction to capital, and repairs and running expenses to income. This was done at the end of each year, and when, as he testified, his memory was clear as to the kind of work which each bill represented, that is, whether repairs or reconstruction.

" If it be true, as I think it is, that as much has been charged to capital as its increase in value will warrant, and that the expenses have been divided as accurately as possible between the two accounts, these remarks apply to both the properties Hotel Pelham and Swampscott; and I accordingly report that no errors are found in these two accounts."

The presiding justice's report was as follows: —

" No. 122 Marlborough Street, Boston, renting for $1,700 a year, had been let to a tenant for ten years, and the lease expired in April, 1891. The house had then to be repaired from top to bottom. The plumbing, worn out and old-fashioned, that had been in use about twenty-six years, had to be entirely replaced at an expense of $1,328 for the plumbing. The furnace, the range, and the plaster had to be repaired, and the house re-

papered throughout. There was no reconstruction. If the tenant had moved out two years earlier, there would probably have been a necessity for the bulk of these repairs. . . . There were also extensive repairs of buildings on the Swampscott estate. . . .

"I find on the testimony of said John M. Little that the permanent value of the Swampscott estate was not increased by all the expenditures on it for repairs and reconstruction beyond the amounts charged in the accounts to capital, and that the income from the estate was increased by said expenditures $2,500 a year.

"Much the greater part of these repairs on the Swampscott estate was made necessary by the wear and tear of the years preceding the date of the testator's death, but exactly how much did not appear, nor did it appear on the evidence that it was possible to determine exactly what proportion of the work done was made necessary by the wear and tear of the years preceding the testator's death, and what was the result of the wear and tear of the time succeeding. Nothing nearer to a determination of this question would have been possible than an approximation by way of estimate, which would not have been nearly accurate. The expense of these repairs was charged to income in the executors' accounts. The contestants contended that these repairs and the repairs of 122 Marlborough Street were not chargeable to income, but I ruled that they were all chargeable to income. If this ruling was erroneous, such further proceedings are to be had as the court may direct.

"In reconstructing and repairing the buildings belonging to the estates upon Eliot and La Grange Streets and Hotel Pelham, it was impossible for the executors to separate by items the amounts which were chargeable to reconstruction and the amounts which were chargeable to repairs, because the repairing was done in the course of the reconstruction and was done by the same men at the same time. The executors made an apportionment of the expense of the work according to their best judgment, charging to income the expense of so much of the work as they considered repairs, and to capital so much of the work as they considered reconstruction. The work at the Hotel Pelham consisted of general repairs, and the work of converting apartments which had been let in suites to families into offices

for business purposes. This work began a year and ten months after the death of the testator. I found on the testimony of John M. Little. that the permanent value of Hotel Pelham was not increased by the work by more than the amount charged in the accounts to capital on account of the work, and that the rental value was thereby increased $2,350. The contestants contended that none of this work considered by the executors repairs was chargeable to income, but I ruled that such of the work as was repairs was all chargeable to income, and the apportioning of the work between repairs and reconstruction, and of the expense of it between income and capital, I found correct. If this ruling is erroneous, there shall be such further proceedings as the court shall direct. There is an error in the auditor's report in reference to Hotel Pelham. The total cost in round numbers is put at $46,000. This should be $32,000, and this amount was expended for lumber, carpenters' work, painters' work, and materials, for papering, plumbing, gas and steam fittings, glass, hardware, etc., charged in the third account. The amount charged to income is put at $30,000, but should be $16,000, as charged in the third account. The $46,000 stated by the auditor included about $14,000 charged in the third account for taxes, coal bills, gas, wages, and other running expenses of Hotel Pelham. The same kind of work of reconstruction and repair the respondents as trustees have been doing ever since the third account was filed, and the work is not yet finished. In the case of the buildings on Eliot and La Grange Streets, the total amount expended was $11,886.46, of which $10,000 was charged to capital and $1,886.46 to income. This also was arrived at by an apportionment, the executors thinking that $10,000 covered the actual value of the work done in reconstruction, although they could make no detailed statement by items of the amounts chargeable to repairs and to reconstruction. I found on the testimony of John M. Little that at least $1,886.46 of this amount was, on a fair estimate, spent in actual repairs on the La Grange Street property, including putting into thorough repair to be used for residence the rooms over the stores into which the first stories of the two dwelling-houses on La Grange Street were turned, these stores being extended seventeen or twenty feet to the rear, and these repairs being done

simultaneously with and in the course of the other work which was begun in April, 1890. I also found from the same testimony that the addition to the permanent value of the Eliot and La Grange Street estates made by the entire work done on them apportioned between reconstruction and repairs was the amount charged to capital; that by this work the annual rental from the Eliot Street estate was increased $2,000, and the annual rental of the La Grange Street estate was increased $1,310, principally by reason of the greater rent that could be obtained for the stores. The whole of the work on the Eliot Street estate was charged to capital. Much the greater part of the repairs on the La Grange Street estate and the Hotel Pelham was made necessary by the wear and tear of the years preceding the testator's death, but exactly how much did not appear, nor did it appear on the evidence that it was possible to determine exactly what proportion of the work done was made necessary by the wear and tear of the years preceding the testator's death and what was the result of the time succeeding. Nothing nearer to a determination of this question would have been possible than an approximation by way of estimate, which would not have been nearly accurate. The contestants contended that the $1,886.46 was not chargeable to income, but I ruled that it was. If the ruling is erroneous, the second account of the executors is to be modified accordingly."

The auditor found that the accounts should be corrected by crediting to income and charging to capital the sum of $6,891.86, because of taxes and some other bills which in the first account had been charged to income instead of to capital. The third account was assented to by four of the six beneficiaries and objected to by two, the contestants. The last named not only claimed two sixths of the $6,891.86, but contended that the remaining four sixths should be held by the trustees, so that the contestants would get two sixths of the income of it, the other four beneficiaries being entitled to no part of it, as they had assented to the accounts.

The presiding justice ruled that this objection of the contestants was not well taken.

*E. W. Hutchins,* (*H. Wheeler* with him,) for the appellees.

*D. E. Ware,* for the appellants.

BARKER, J.   The appellees were named by the will executors and trustees, and until they were appointed as trustees by the Probate Court it was their duty as executors to administer the estate in accordance with law and the will of the testator. They are found to have acted with care and prudence, and the . questions argued relate to their charges and expenses of administration, and to the question whether certain of their expenditures should be borne by the capital or the income of the estate.

1. The executors charged a commission upon the proceeds of a sale of a house and lot, and the appellants contend that the executors are not entitled to compensation for the sale of real estate.   But the question does not arise, because the commission charged upon the sale was, with other commissions, disallowed in the Probate Court, and a lump sum was allowed to the executors for their services, which allowance was affirmed by the single justice of this court.   No reason is shown why the sum so allowed was not a fair and reasonable compensation for the services in respect of which it was allowed.

2. The estate was comparatively a large one, composed of real and personal property in amounts nearly equal.   The debts were inconsiderable, and the scheme of the will contemplated the keeping of substantially the whole principal in the hands of the appellees for a long period, although the income would be distributed quarterly.   One of the appellees had the full management of the estate for some years in the testator's lifetime, as his agent under salary.   The will provided that he should continue to have the charge and management of the property, and should continue to receive for such services compensation, independent of the trustees' commissions, at the same rate as his former salary.   After the probate of the will, an agreement by which this salary was reduced was made by all parties, including the appellants.   They now contend that the payments of compensation on this account should be disallowed, because not justified by the will before the trustees were appointed by the Probate Court.   But it is evident that it was the intention both of the testator and of the parties to the agreement that there should be no interruption in the services to be rendered, and the decree of the Probate Court and of the single justice of this court allowing the charges for this compensation was right.

3. Some portions of the real estate were, at the death of the testator, out of repair, and so situated and of such character that good management required large expenditures upon them in the nature partly of permanent improvements and partly of repairs, by the making of which they were adapted for new uses, and were then leased. So far as the expense of these changes was defrayed with the capital of the estate, the appellants contend that the expenditures ought not to be allowed, because the appellees had not then been appointed trustees by the court. But the expenditures have been found to be wise and judicious, and it is plain from the facts stated that they were necessary, and to the advantage of the estate. The same persons were named by the will as executors and trustees, and all the property, real and personal, was devised to them, and the responsibility of management was upon them from the time of the probate of the will, by whatever official name they may have been designated. Without objection from any one, they qualified in the first instance as executors only, and they proceeded in the management of the estate as a whole, without objection or protest, distributing the income from time to time among the beneficiaries. Although it would have been more regular for them to have qualified as trustees, they were the persons to whom the property in their charge both real and personal was given by the will, and who had a right as trustees to make the expenditures. The objection urged is purely a technical one, and is fully answered by the fact that since they became trustees they have in that capacity adopted and ratified their acts as executors in the management of the real estate. Under the circumstances of this case, we are of opinion that the items of expenditures were properly included in their accounts as executors. See *Hull* v. *Cushing*, 9 Pick. 395 ; *Newcomb* v. *Williams*, 9 Met. 525, 534 ; *Miller* v. *Congdon*, 14 Gray, 114, 115.

4. The appellants contend that none of the expenses upon the real estate should be charged to income. But this is a question of detail, in the treatment of which no error not corrected by the Probate Court is shown, and the matter seems, after a very minute and careful investigation, to have been correctly dealt with in the accounts as allowed. The ruling that such of the work as was repairs was chargeable to income is plainly

correct, and the apportionment by the Probate Court of the expense between capital and income was, in our opinion, right.

5. The contention that the appellees and those beneficiaries who acquiesced in the allowance of the accounts as rendered should not have the benefit of the correction of the error in charging certain expenditures to income is untenable. The error was not one of administration, but of accounting. No harm finally resulted from it to the appellants, and to allow their contention would be to give them a benefit from the error which has been corrected upon their request, as well as from its correction, and to inflict without reason a forfeiture upon others.

*Decree affirming the decree of the Probate Court affirmed.*