FREDERICK A. BRIGHAM & another, executors, *vs.* EDITH R. MORGAN & another.

FREDERICK A. BRIGHAM, trustee, *vs.* SAME.

Worcester. January 21, 1903. — January 25, 1904.

Present: KNOWLTON, C. J., MORTON, LATHROP, BARKER, HAMMOND, LORING, & BRALEY, JJ.

*Probate Court. Executor. Evidence. Practice, Civil. Trust,* Duties of trustee as to investments. *Words,* "Before approving the same."

St. 1889, c. 311, providing, that after any account of an executor, trustee or other person required by law to render an account in the Probate Court, has been filed, the judge of that court may, "before approving the same," appoint one or more auditors, authorizes the appointment of an auditor to report upon accounts of an executor previously approved by the judge, upon an application by the beneficiaries to reopen those accounts, made before the executor's final account has been allowed.

An expenditure by executors, from the funds of an estate, of $80,000 in two years, in an attempt to develop a tract of vacant land upon the outskirts of a city in a distant State, appraised at only $12,000, resulting in a net loss of $40,000 at the end of three months after the two years, rightly is disallowed as an investment, even if the money had been lying in the hands of the executors uninvested and the executors would have been justified in temporarily investing it.

Even if oral directions, given by a testator in his lifetime to one who is expected to act as his executor, ever will justify that person when appointed executor in making an expenditure otherwise improper, yet if in giving such oral directions the testator stated that he had made arrangements in his will, he must be understood to have referred to that instrument as the guide, and unless the will provides otherwise the executor will be held to the liabilities imposed upon him by the general law.

On the issue of disallowing in an executor's account the expenditure of a large sum of money in attempting to develop a tract of vacant land upon the outskirts of a city in a distant State, no exception lies to the exclusion of evidence, that men of prudence, discretion and intelligence in the East, especially in Boston, as well as conservative institutions for savings, were making investments similar to that in question.

No exception lies to the exclusion of evidence of a fact afterwards found in favor of the party offering the evidence.

In an account of an executor, an investment properly is disallowed of $2,500 from the funds of the estate, made by depositing that amount with a loan and trust

company organized in a distant State upon the understanding that an unsecured debenture bond should be issued for the deposit, where the trust company has failed and the bond is of no value.

An assent in writing by the beneficiaries of an estate to the allowance of a series of accounts, filed by two executors before their final account, does not operate as a ratification of improper investments stated in the accounts, if the accounts were not true, containing misrepresentations wilful on the part of one of the executors and which the other executor did not know to be true.

Two executors, one of whom was sole trustee under the same will, made an improper investment of $80,000 which proved to be worth only $40,000. This investment was turned over by the executors and received by the trustee at the value of $80,000. Later the trustee rendered a series of probate accounts covering nearly seven years, in which he stated the investment at the same value. Both of the executors, one of whom was the trustee, acted in bad faith. *Held*, that, not only were the executors liable for the loss on the investment, but also the trustee as such was liable for the same amount. HAMMOND, LORING, & BRALEY, JJ. dissenting.

Where executors are found to have acted in bad faith in making an improper investment of the funds of the estate, it is right to charge them with interest at the rate of six per cent upon the amount of the loss on the investment.

BARKER, J. These cases bring to this court as the Supreme Court of Probate the statement and allowance of two sets of probate accounts rendered to the Probate Court in Worcester in the estate of Thomas Rice, deceased. The first set consists of the third, fourth, fifth and sixth accounts of Frederick A. Brigham and Herbert A. Maynard as executors of the will of Rice, who died on May 29, 1888, which was admitted to probate July 3, 1888, when the executors were appointed and qualified, giving separate bonds.

The third executors' account, assented to in writing by the parties interested, and sworn to by the accountants on July 29, 1891, was allowed by the Probate Court on September 11, 1891.

The fourth executors' account, also assented to, and sworn to on August 8, 1893, was allowed by the Probate Court on July 6, 1894.

The fifth executors' account, also assented to, and sworn to on August 4, 1896, was allowed by the Probate Court on August 25, 1896.

The sixth executors' account seems to have been presented to the Probate Court on May 12, 1898. In dealing with it that court reopened the third, fourth and fifth accounts, and its decree, reforming and allowing the third, fourth, fifth and sixth

accounts, was entered on October 2, 1900, and an appeal therefrom was taken and entered in the Supreme Judicial Court by each of the two executors and by the persons who are sureties on their official bonds, but no appeal was taken by the beneficiaries.

The first trustee's account, assented to in writing and sworn to by the accountant on July 29, 1891, was allowed by the Probate Court on September 11, 1891.

The second, assented to and sworn to on April 22, 1892, was allowed on October 11, 1892.

The third, assented to and sworn to on June 8, 1893, was allowed on June 6, 1894.

The fourth, assented to and sworn to on June 25, 1894, was allowed on August 25, 1896.

The fifth account was sworn to on August 17, 1895; the sixth on August 10, 1896; and the seventh on January 14, 1897. These three seem to have been presented to the Probate Court on January 14, 1897. The eighth was sworn to on September 15, 1897, and presented to the Probate Court on September 17, 1897. There was no assent in writing by the parties interested to the fifth, sixth, seventh or eighth accounts and these were before the Probate Court pending allowance until April 13, 1900. In the meantime, on July 12, 1897, there was a petition to the Probate Court for the reopening of the first four trustee's accounts, which was referred by that court to the same auditor to whom the investigation of the last four trustee's accounts had been committed.

On April 10, 1898, the Probate Court by its decree reformed and allowed the eight trustee accounts, in effect reopening the first four, and an appeal to the Supreme Judicial Court was duly taken and entered from the decree of April 10, 1898, by the trustee and by the sureties on his official bond, but no appeal was taken by the beneficiaries.

While the cases were pending in the Probate Court upon the allowance of the accounts, that court removed the original executors and appointed an administrator *de bonis non* with the will annexed and also removed the original trustee and appointed a new trustee in his place. No appeal was taken by the administrator *de bonis non* or the new trustee from the decree allowing the accounts in the Probate Court.

Upon the appeals the matters of the executors' accounts and of the trustee's accounts were heard together by a single justice of the Supreme Judicial Court, and on January 25, 1902, decrees were entered by him in each matter, affirming with modifications the decrees of the Probate Court. Bills of exceptions taken by Brigham as executor, Brigham as trustee, and by Maynard as executor at the hearing before the single justice were filed, allowed and entered in the full court; and appeals from the decrees of the single justice were taken and entered in the full court by Brigham as executor and also as trustee, and by Maynard as executor.

The exceptions and appeals to the full court were argued on January 21, 1903, and afterwards were considered upon the briefs by all the justices.

The testator left a widow and two children, the latter being minors at the time of the testator's death, the elder being a daughter and the younger a son.

His will gave to his wife his homestead and the personalty connected with it, and also gave certain minor legacies. It created two funds of $15,000 each, one for the benefit of each child, the income of which was to be paid to the guardian of the child during the minority. The fund for the daughter was to be paid over to her when she should arrive at the age of twenty-one, and that for the son was to be paid to him when he should arrive at the age of thirty.

The residue was devised and bequeathed to the executors, but in trust, namely, to pay over and transfer to his wife one third part thereof in value and to pay over or transfer the other two thirds thereof to trustees to hold and manage for the benefit of the two children. It is this fund the accounts of the trustee of which are the trustee's accounts in question.

The daughter became of age on February 2, 1890, and the son before July 5, 1894.

The controversy between the accountants and the beneficiaries arises from investments of $81,100, made by the executors in mortgages upon land in Kansas, and of $2,500 in a bond of or a deposit in the Commonwealth Loan and Trust Company of Kansas. These investments were disapproved by the Probate Court and by the Supreme Judicial Court sitting with a single

justice, and the changes from the accounts as rendered by the accountants made upon the allowance of the accounts by the Probate Court and by the Supreme Judicial Court in the final decrees entered by the single justice come from holding that the investments mentioned were unwarranted, or in other words that they were a maladministration on the part of the accountants. Whether these investments should be so held is the chief question in controversy. If they should be so held, the principal remaining question is how the accounts should be reformed, stated and allowed.

The accounts were referred to an auditor by the Probate Court, and the auditor's reports, although objected to, were admitted in evidence in the Supreme Judicial Court in the hearing before the single justice. The other evidence at that hearing is in the record, which also contains a memorandum made by the presiding justice concerning the facts found by him.

The Probate Court while holding that the investment of the funds of the estate in the Kansas mortgages and bond to the amount of $83,600 of principal were unwarranted did not charge the executors with the whole sum so maladministered. The auditor found that the Kansas mortgages which had been turned over by the executors to the trustee at their face value of $81,100 were in fact worth when so turned over $40,000, while the Kansas bond was worth nothing. The Probate Court struck out from the executors' accounts all credits on account of the principal of the Kansas mortgages and bond except the sum of $40,000 found by the auditor to have been the value of the mortgages when turned over to the trustee. The Probate Court also charged to the executors sums for interest at six per cent per annum on the $43,600 thus disallowed. It also rejected certain other items as a corollary of its rejection of the $43,600, as, for instance, credits claimed by the accountants for the expense of this litigation.

The trustee voluntarily had taken over into his trust the Kansas mortgages at their face value of $81,100, and the Kansas bond at its face value of $2,500, and had put them into his official inventory at the same figures and had charged himself with them in his trustee's accounts at the same amount for principal. He took and should now have the mortgages and bond as trustee,

and when he shall turn them over to the new trustee, if he has administered them properly since he received them, he will then be entitled to a credit for their amount as principal in the sum of $40,000 found by the auditor as their actual value. The trustee was charged by the Probate Court with interest at the rate of six per cent per annum on the amount of $43,600 lost by the improper investment in the Kansas mortgages and bond.

The theory of the action of the Probate Court was the same in dealing with each set of accounts, and was to hold the executors answerable for the loss of $43,600 of principal and for interest upon the amount lost, and to hold the trustee answerable for the same loss of principal, he having taken over and charged himself with the unwarranted investments at their face value, and with interest upon the $43,600 from the beginning of his work as trustee.

The question is raised by the bills of exceptions whether the reports of the auditor made to the Probate Court were admissible in evidence in the hearing in the Supreme Judicial Court. It is contended that the appointment of the auditor by the Probate Court was not authorized by law. In discussing this question, we assume in favor of the accountants that the power of the Probate Court to appoint an auditor rested at the time of these proceedings upon St. 1889, c. 311, which, so far as material, reads as follows: "After any account of an executor, . . . trustee or other person required by law to render an account in any Probate Court, . . . the judge of said court may, before approving the same, appoint one or more auditors," etc.

The auditor has reported only upon the accounts of the executors. At the time the auditor was appointed, the executors had filed six accounts, of which the first five had been consented to and allowed without a hearing. No final account had been filed. The executors' accounts were therefore still open for correction. In this state of affairs, the children of the testator, each being then of age, asked that the accounts be reopened on the ground that they were incorrect. We do not understand that, under the circumstances disclosed in the auditor's report, the accountants contend that upon this request the Probate Court had not properly before it the question whether the accounts should be re-

opened, and if so, what corrections should be made and how they should be finally allowed. Their contention is that the statute is not applicable to an account which has once been allowed, even although the Probate Court has jurisdiction to reopen such an account for correction and upon proper proceedings has that question before it for adjudication.

We are not inclined to adopt this narrow construction of the statute. The statute is remedial in its nature and should receive a construction consonant with its manifest purpose, which is to relieve the court from making a personal examination of the details of complicated accounts, and to enable it to call in the services of an auditor to assist. The reason for appointing an auditor exists whenever such an examination becomes necessary upon a question involving the final approval of the account. The statute should not be construed to forbid the appointment of an auditor whenever the judge of probate has occasion to make such an examination as a preliminary to a final approval, simply because he has once approved the account. In a general sense, it may be said that an account is before the judge for approval whenever by a motion to reopen or otherwise he has before him the question whether he will finally approve it or not; and that is none the less so in the case where he has once approved it. Whenever the question of approval comes before him for decision he is entitled to the services of an auditor before deciding the question. This construction is in accordance with the spirit of the statute, and not inconsistent with the fair meaning of the phrase " before approving the same." See *Longley* v. *Hall*, 11 Pick. 120.

Concerning the controversy as to the investment of the sum of $81,100 in mortgages upon land in Kansas, the principal question is whether the loss which was incurred in an attempt to develop certain land in that State owned in common by Brigham and the testator should be borne by the estate, or should fall upon the accountants. Upon this matter it appears from the memorandum of the presiding justice that he found the facts to be substantially as follows.

A few months before the death of Rice the testator, which occurred in May, 1888, he and the accountant Brigham purchased a tract of land of about forty acres, situated upon the outskirts

of the city of Topeka in the State of Kansas, paying therefor the sum of $22,000. They held this land as tenants in common. Rice paid the entire purchase money, and Brigham gave his note to Rice for one half thereof, with the understanding and agreement that the note should be paid out of the money received from the first sales of lots in the tract. Rice and Brigham caused the land to be plotted and divided up into streets and building lots, to the number of three hundred and eighty-four lots, with a frontage of twenty-five feet each ; and a plan showing the streets and lots and designating the tract as the "Brigham and Rice Addition" was duly recorded in the registry of deeds.

The auditor finds that at the time of the death of Rice none of these lots had been sold, but it is stated in the exceptions that just before his death, in accordance with the plan for handling and developing this property which had been agreed upon between him and Brigham, an agreement was made which provided for the loan of money by Rice to a certain prospective purchaser for the purpose of building a house upon one of these lots.

While matters were in this condition, Rice died, his will was admitted to probate on July 3, 1888, and on the same day Brigham and Maynard duly qualified as executors. The inventory filed in the September following showed personal estate appraised at $326,587.76, and real estate in this Commonwealth appraised at $28,675.50. To this inventory was attached a memorandum of real estate outside of Massachusetts, including one undivided half of this land, " valued by the executors at $12,000."

After the executors were appointed, they proceeded in the following manner with the funds of the Rice estate to develop and put upon the market this land. They employed an agent residing in Topeka, to negotiate sales of lots and to arrange for mortgages back from the purchasers to secure the purchase money and additional loans to be made to them to enable them to build houses. Lots, usually three in number, of twenty-five feet by one hundred and twenty-five feet each, were sold to a purchaser at a valuation of $500, and a deed thereof was given by the executors. The purchaser at the same time gave a mortgage thereon to Brigham for an amount sufficient to cover the pur-

chase price and the estimated cost of building a house. The purchaser then proceeded to build the house, and, as the work progressed, money belonging to the estate was advanced to pay the cost of building. The purchaser paid no money to the executors. In some instances he expended some money and labor in making improvements in addition to the amount advanced by the executors, but in general the entire cost of building and improvement was paid by the executors. The houses were of poor quality, the majority of them costing from $1,000 to $1,200 each. About forty were built between July 3, 1888, the time of the appointment of the executors, and July 15, 1890. These mortgages, as before stated, were made directly to Brigham, and were so made for the purpose of enabling him conveniently to manage and deal with the same and with the view that he would ultimately take and hold the same as trustee. At the time the executors began to advance the money and take the mortgages, it was agreed and understood between them that upon the appointment of Brigham as trustee under the will he would take the mortgages at their face value, as so much cash, as a part of the trust fund, and would receipt to his co-executor Maynard in full for the amount thereof, the same as though the mortgages were cash. When sales were made and mortgages taken back, Brigham applied one half of the price fixed as the valuation of the lots toward the payment of his note, given as above stated, to Rice. Brigham during all this time was fully conversant with the property and its surroundings, but Maynard never had seen it, knew nothing about its value, and in these matters acted wholly upon the advice and opinion of Brigham. He however signed with Brigham the drafts and checks by which the money was sent to Topeka, and was fully aware of the manner in which the investments were made. The land was situated about three miles from the centre of the city, and this money was expended at a time of inflated values. The purchasers and mortgagors were as a rule poor and unstable, and becoming discouraged abandoned their properties. Under these circumstances and in this way, the executors took from the estate and expended cash to the amount of $81,100.

The result was what might have been expected. With a few minor exceptions no interest has ever been paid upon these

mortgages, and as early as October 2, 1890, the time when Brigham took them to himself as trustee and gave to his co-executor the receipt hereinafter named, in which he valued them as cash to the amount of their face value, all of the mortgagors had defaulted in the payment of principal and interest. Some had abandoned their properties. Some of the mortgages had been foreclosed or the equity purchased by Brigham, and the value of the property represented by them was only $40,000. In a word, the executors, in their attempt to develop, in the manner above stated, at a time of inflated values, a tract of vacant land situated upon the outskirts of a city in a distant State, and in which the estate according to the appraisal was interested only to the extent of $12,000 and, according to the cost, only $11,000, actually expended in two years over $80,000 in cash, with the net result that in three months afterwards, namely, in October, 1890, there was a loss of more than half of the sum expended. Such an expenditure cannot be justified. It was the duty of the executors to collect and hold the estate. This expenditure was not required to preserve the interest of the estate in the land. Even if the money had been lying in their hands uninvested, which is not shown to have been the fact, and even if, pending the appointment of the trustee, the executors would have been justified in temporarily investing it, these transactions cannot be held to be proper investments. While it is true, as suggested by the accountants, that the propriety of an investment is to be judged of with reference to the time in which it is made, still, when it is considered that the scheme in pursuance of which this money was spent belongs to a class of business operations generally of a speculative and hazardous nature, and also that in this case it was pursued under circumstances which more and more indicated that the demand for the land and houses was apparent and not real, and that in substance the executors were building houses which no responsible persons would buy, it cannot be denied that these transactions fall far short of that prudence and sound business judgment which is required of persons acting in a fiduciary capacity. It was a hazardous investment in a hazardous class.

It is contended on behalf of the accountant Maynard that, inasmuch as the mortgages were not made to the executors but

to Brigham, and the money was lent with the intention that they should be received by him when qualified as trustee, as a part of the trust fund, and were actually subsequently so received by him, the investment was made by Brigham and not by the executors, and that he as trustee and only as trustee is liable, and that the executors are not liable. We cannot accept the view that the investment was not made by the executors. While it is true that the matter was left by Maynard largely if not entirely to Brigham, still the money was in their hands as executors and Maynard joined in making the drafts and checks sent to Kansas. Moreover there was no person to whom as trustee any money could be properly paid, or by whom as trustee any money could be invested, and both accountants knew this. The mortgages did not run to Brigham as a trustee but as an individual, and were held by him for the executors under the agreement heretofore named between him and Maynard that when he qualified as trustee he would take them from the executors as a part of the trust fund. It further appears that, until October, 1890, when the securities were turned over to Brigham as trustee, the executors in their various accounts treated them as belonging to the estate and as assets in their hands as executors. They charged themselves with the interest on the same, and, although in fact the interest had not been received, Maynard supposed that it had been and that these charges were correct. The charges, therefore, although not in fact true, show Maynard's idea of the relation of the executors to the investment. In view of these and other circumstances, it seems clear that the executors made this investment as such, and that both of them so understood it.

It is further contended by the accountants that these investments were made in pursuance of a plan settled upon by Rice before his death, and in compliance with verbal instructions which he gave to them as to what they as executors should do; and in support of this contention they introduced evidence to show that Rice, a few days before his death, while ill, told Maynard that in partnership with Brigham he had made an investment in the West; that they had bought a tract of land which they had begun to develop; that it had been plotted into lots, streets had been constructed and an electric road had been

built through it; that the lots were to be sold and that money was to be lent to the purchasers with which to build houses upon them; that mortgages were to be taken back to secure the loans; that Brigham was familiar with the land, and that he, Rice, had made provision in his will for carrying on the matter in case he should die while it was in progress; and that he wanted Maynard, if appointed executor, to allow Brigham to manage this property because he was familiar with it.

We do not find it necessary to decide whether, or how far, verbal directions given by the testator in his lifetime to a person who is expected to act as his executor will justify an executor, because, even if this testimony was believed by the presiding justice, it is clear that after all Rice expressly stated that he had made arrangements in his will, and he must be understood as referring to that instrument as the guide. Without reciting in detail the provisions of the will, it is sufficient to say that there is no express allusion in it to this property; that in its general framework there is clearly manifested an intention that the estate shall be prudently managed, and that investments shall be made in the exercise of sound judgment, " notes properly secured by first mortgages" being expressly named.

These facts, taken in connection with the further fact that the power to sell which is contained in the will is not confined to the persons named as executors, but is given to any administrator *de bonis non*, and is couched in the usual language of such provisions, clearly show that no inference can be drawn from the will that these executors were not to be held to the liabilities imposed upon them under the general law.

The evidence offered to show that, at the time these investments were made, men of prudence, discretion and intelligence in the East, and especially in Boston, as well as conservative institutions for savings, were making just such investments in mortgages, in addition to western loans similar in all respects to the investments in question, was properly excluded. This is not a case where, as in the case of some well known classes of securities, such as bonds or stocks, it could be shown that they had a general market value and a good reputation so that prudent people had made investments in them. It was simply an attempted development of a piece of land in the outskirts of a

certain city.   It is manifest that the propriety of such an investment must depend upon the peculiar circumstances surrounding it, and evidence that prudent and conservative men had seen fit to embark in a similar undertaking in some other locality would not aid in passing upon the propriety of this.   Either such evidence must be of the most vague and general character, and therefore of no practical value, or, if special, it would lead to an inquiry into special circumstances and to comparisons in no way helpful.   The presiding justice might properly exclude it in the exercise of his discretion.

The executors were not prejudiced by the exclusion of the evidence offered to show that at the time these loans were made there was an agreement between Maynard and Brigham that the latter, when he should be appointed as trustee, would accept these securities as trust securities at their face value, and would accept the same as cash.   The court found such to be the fact.

We are therefore of opinion that the executors had no right to invest the $81,100 in the Kansas mortgages, and that those mortgages were not securities which the trustee rightfully could receive as part of the trust estate.

We have the same view as to the deposit of $2,500 in the Commonwealth Loan and Trust Company of Kansas.   This was a land company organized under the laws of Kansas having a branch office in Boston where the deposit was made, upon the understanding that a debenture bond of the company should be issued for the deposit.   There was no mortgage or other security for this bond, and the company soon after failed and nothing has been received in payment of the bond, which the auditor has found to have had no value.

The executors not having been warranted in making the investments and the trustee not having been warranted in receiving or holding them as part of the trust fund, we are to consider how their respective accounts shall be reformed in consequence of the maladministration.

The accountants contend that even if these investments were unwarranted they are exonerated from liability for them because their acts with reference to the investments have been ratified by the consent given by the beneficiaries to the allowance of the

early accounts in which the investments were stated. One simple reply to this, however, is that the accounts were not true. They represented that some thousands of dollars had been received from the sales of land, and that the interest upon the mortgages had all been promptly paid, whereas in fact not a dollar in cash had been paid to the estate by any purchaser, for the land, and all the mortgages were in default upon the interest. Even if it be true that the beneficiaries knew in a general way that the executors were selling the land and lending money to the purchasers for building purposes, the accounts seemed to show a healthy demand for the land and a buying class of purchasers, a very different state of things from that which would have been disclosed if the facts had been truthfully stated. This misrepresentation, so far as respects Brigham, was wilfully untrue because he knew the facts, and so far as respects Maynard, was fraudulent in law if it was a statement made by him as true of his own knowledge when he did not know it to be true. Such a misrepresentation is sufficient, under the circumstances disclosed by the auditor, to avoid the consent given by the beneficiaries, and the case therefore stands as if such consent had not been given.

Another contention is that the executors have been relieved from their liability by the action of Brigham before and after his appointment as trustee.

In this connection it is to be noticed that both Brigham and Maynard acted in bad faith. The finding to this effect of the single justice by whom the cases were heard in the Supreme Judicial Court was contrary to that of the auditor, the decrees of the Probate Court containing no express statement upon the matter. The finding by the single justice of the Supreme Judicial Court, the accountants having testified before him in the hearing, and other oral testimony taken must stand. The fact that Brigham was personally interested in the development of the land and that this interest was known to Maynard his coexecutor and that the mortgages ran to Brigham individually, with the misrepresentations as to payment of interest on the mortgages, and the concealment of the fact that foreclosures of them were being made, all were circumstances tending to support the finding of bad faith on the part of both Brigham and May-

nard, so that the exceptions on this branch of the case must be overruled, and the finding of bad faith must stand.

Before dealing with the question of Brigham's action as trustee, we think it best to consider whether, when an executor has maladministered a fund by investing it in improper securities and these securities have been received improperly from the executor by a trustee and unwarrantably placed in the trust fund, both delinquents can be held answerable in their accounts. The question should have the same answer whether the two officials are one person or different persons. Different acts of one man done in two separate capacities may make it his duty to account for the same matter in each of those capacities. A., receiving as executor money which it is his duty to turn over to himself as trustee, by putting the money into an improper investment has made it right to charge him in his executor's account with the whole fund. As trustee it is his duty to get the whole amount of the fund into his hands, and to hold it in proper securities and apply it to the purposes of the trust. If, instead of performing this duty, he improperly accepts and takes and holds as trustee the unwarranted investments, and does nothing to get the whole amount of the fund into his hands in property which he may rightfully hold in the trust fund, he may properly be charged by the court in his accounts as trustee with the whole amount of the fund for which he has receipted and with which he has charged himself in his inventory and his accounts as trustee and which it was his duty to get in, put into proper securities and hold.

The liability of the executor to be charged in his executor's account with the whole amount of the money which as executor he has put into unwarranted investments comes from his official relation as executor to the money. The liability of the trustee to be charged in his account as trustee comes from his official relation to the trust fund of which it is his duty as trustee to see that the money is made a part, and from his having taken over as a part of the corpus of the trust the unwarranted investments and his having inventoried and kept them as a part of the trust, and charged himself with them in his accounts as trustee as of full value. That he has failed to discharge his duty as executor is no sound defence when it is proposed to charge him for his

default as trustee. Nor is it a sound defence when it is proposed to charge him for his default as executor to show that as trustee he has committed another maladministration, namely, by improperly accepting and holding as good the unwarranted investments as part of the corpus of the trust fund.

The logical course is to charge him in each capacity with the sum which he has maladministered. If he or his sureties in either capacity once make restitution of the whole sum maladministered, with proper interest, the beneficiaries can require nothing more, being entitled to but one satisfaction. But until such restitution is made there is no injustice done either to the delinquent principal or his sureties in charging him in his probate accounts in each capacity with the full amount of the estate which he has maladministered. In stating each account the question is with what sums he should be charged and credited. How ultimate losses to beneficiaries are to be borne, and how sureties upon different bonds shall make or have contribution in respect of prospective payments is not the decisive issue upon the settlement and allowance of accounts like those now under consideration.

The statement of *Wilde*, J. in *Conkey* v. *Dickinson*, 13 Met. 51, at page 53, that it was clear that Dickinson, whose bond as guardian was in suit and who also was the executor of the will which gave to his ward the legacy which remained unpaid, was not liable for the payment of the legacy in both capacities, is to be taken in connection with the circumstances of that case. The subsequent statement in the same paragraph, that it is " well settled, that if a legacy is given by will, and the same person is executor and trustee or guardian for the legatee, he is bound to account for the legacy, as executor, if he has sufficient assets, unless he has rendered an account in the probate office, charging himself as trustee or guardian, and that account has been allowed by the Probate Court " shows that the true test whether an executor shall be charged in his probate account is whether, having received funds, he has administered them in accordance with law. We know of no declaration in our decisions that any person who in an official capacity has received funds is not liable to account for them in that capacity; and we see no reason why it may not be just to hold that he is so liable. Of course proof that the

funds have in fact gone to some extent to the benefit of those entitled to them may, as was done by the Probate Court in the present instance, make it just and equitable to lessen the charge to be made in stating the account.

We do not put the liability of the trustee to be charged upon his account in a case of this kind merely or chiefly upon his duty to get in all the property that is subject to the trust; but largely upon the fact that he has assumed to act officially in regard to the whole fund. He has in the present instance himself dealt as trustee with the Kansas investments. As trustee he was entitled to the rest and residue of the estate. As a part of that he took the Kansas investments. They were receipted for by him as trustee at their full face value and as so much cash. He carried them along in the same way through seven or eight accounts rendered to the Probate Court both before and after he had settled with the widow. It is not unjust or inequitable as to him or as to the sureties on his bond as trustee to say that he shall account for the sums which he has thus treated as invested and as so constituting a part of the trust fund. He has by his own conduct made himself accountable for the whole fund, and liable, as for making an improper investment, for that part of it which he received in the form of improper investments. He undertook to receive, manage and control the entire fund as if it had been paid to him in money. He took all the bad investments and receipted for them at their face value as if they had been good. He included them in a series of accounts covering nearly seven years. In schedules annexed to these accounts he treated them as good investments, and as representing with other property the entire fund undiminished by losses. Under these circumstances his liability upon his account is the same as if, as trustee, he had received the fund in money and invested it in the mortgages and the bond. In his official capacity as trustee he makes the investments his own, and must be charged for that part of the trust property which is represented by them.

The executors in their official capacity and contrary to their official duty made improper investments from which the beneficiaries have suffered. The trustee in his official capacity and contrary to his official duty has taken over the same improper investments and held them in the trust as good, from which

conduct the beneficiaries have suffered. Both the trustee and the executors, in their respective official capacities should be held accountable for the loss to the beneficiaries, until the latter have been fully compensated, in like manner as the holder of a promissory note is entitled to judgment and execution for the full amount of the note against both maker and indorser, or the obligee in a bond is entitled to judgment and execution for the full amount against the principal and the sureties. There might be found a more remote analogy, upon which we do not rely, in the right of one injured by a tort in which more than one person was a tortfeasor, to have judgment and execution for his full damages against each tortfeasor.

When a probate account is up for allowance, and it appears that the accountant has made an unwarranted investment of funds he may be charged with the full amount of the money improperly invested. *Burgess* v. *Keyes,* 108 Mass. 43, 45. *Kimball* v. *Perkins,* 130 Mass. 141, 143. *Thayer* v. *Kinsey,* 162 Mass. 232, 236. This is " to put the whole assets of the estate, not already disposed of and accounted for in a proper manner, into the control of the judge of the Probate Court, so that he may proceed with its settlement and direct the course of its further administration." See *Choate* v. *Arrington,* 116 Mass. 552, 556.

We therefore assume that the maladministration of the executors, by which they unwarrantably invested the sums put by them into the Kansas mortgages and the trust company deposit, makes it right to charge them in their executors' accounts with the whole loss incurred by their maladministration, and that the maladministration of the trustee, in improperly accepting the unwarranted investments and in omitting to demand and to get in the full amount of the trust fund in cash or proper securities, makes it right to charge him in his trustee's account with the whole amount which it was the duty of the executors to pay over to him as trustee. We are to inquire whether any sufficient reason is shown why such charges should not be made in each set of accounts.

The contention that such charges should not be made because of the assent of the beneficiaries has already been disposed of.

Another contention of the executors is that they are discharged from liability as executors because they have caused an actual

transfer of the unwarranted securities to be made to the trustee, he having agreed when the investments were made that when appointed trustee he would accept them as trustee, and because he has given to the executors his receipt as trustee for the securities as of full value, and because executors' accounts and trustee's accounts showing this transfer from the executors to the trustee have been rendered to the Probate Court and allowed.

Aside from the rendering and allowance of probate accounts, this contention seems to us to be disposed of by the fact that the executors and the trustee all acted in bad faith. Maladministration of funds so committed, whatever form it took or however attempted to be disguised by a receipt, could not discharge the executors from their liability to account for money which had come to their hands.

An actual appropriation or transfer to a trustee by an executor of funds which are to be part of a trust fund, with the rendering of a probate account containing a statement of such appropriation or transfer and the final allowance of that account in court, works a discharge of the executor's liability as such. See *Newcomb* v. *Williams*, 9 Met. 525; *Conkey* v. *Dickinson*, 13 Met. 51; *Minot* v. *Amory*, 2 Cush. 377; *Miller* v. *Congdon*, 14 Gray, 114; *Choate* v. *Arrington*, 116 Mass. 552; *Crocker* v. *Dillon*, 133 Mass. 91; *Bassett* v. *Granger*, 140 Mass. 183; *Little* v. *Little*, 161 Mass. 188. The reason is that the executor stands as having performed his duty as to the funds which came to his hands, in that, whether or not at some period of his administration he had dealt improperly with the fund, he has finally accounted for it according to law, as is shown by the decree, unreversed, allowing the account.

But the record shows no probate account now standing as allowed, bearing a statement of the appropriation or transfer to the trustee at their face value of the improper securities. All such accounts have been reopened by the Probate Court, either expressly or by necessary implication, and in the present state of the proceedings are before us, not as allowed accounts but for proper action. They furnish no ground for a discharge of the executors or of the trustee from liability to account respectively for the whole loss to the testator's estate, or to the trust estate.

What information we have as to the present title to the assets which now represent the unwarranted investments and their present value is found in the reports of the auditor to the Probate Court, and in the decree of that court on the executors' accounts. The first report was filed on December 14, 1897. It states that at that time the title to about all the lands covered by the Kansas mortgages stood in the name of Brigham as an individual, or in that of his son or daughter; and also that about all the lands had been sold for taxes, but that the right of redemption had not then expired. The second report, filed July 22, 1898, states that the value of the mortgages at the time when they were taken over by Brigham as trustee, August 1, 1890, was $40,000, and that of the trust company bond nothing. The decree of October 2, 1900, entered by the Probate Court, reforming and allowing the executors' accounts, states that the value of the Kansas mortgages and of the trust company bond, which together cost the executors $83,600, when the trustee received the same was only $40,000.

The Probate Court increased the balance due from the executors by their third account, by this difference of $43,600 between the par value of the Kansas investments and the value of the same when they were received by the trustee, and by a further sum for interest on the improper investments. The decree of the Supreme Judicial Court entered upon appeal affirmed the allowance of the executors' accounts with these charges. The effect of this was to allow the executors credit for the sum of $40,000 as the actual value of the Kansas investments when the same were turned over to the trustee out of the $83,600 which they had improperly invested. Neither the beneficiaries of the trust, who are now of full age, nor the new trustee appointed in place of Brigham removed, have appealed from the decrees of the Probate Court or from those entered in the Supreme Judicial Court by the single justice. It must be assumed that the Kansas investments were made part of the trust fund and were of the value of $40,000 when received by Brigham as trustee, and that the beneficiaries are content to have them made a part of the trust fund at that valuation as of that time. While, therefore, those decrees might perhaps be changed so as to charge the executors in account with the whole $83,600,

under the circumstances we do not deem it incumbent on us so to do.

The same consideration, that the $40,000 worth of securities was put by the executors where it was worth that amount to the fund, does not require the trustee now to be credited, in the statement of the trustee's accounts, with the value of the securities at that sum, for the reason that they are still a part of the trust in his hands, to be turned over by him at that valuation to his successor.

The finding of bad faith on the part of both Brigham and Maynard makes proper the charges of interest at the rate of six per cent made in the decrees of the Probate Court and of the Supreme Judicial Court.

The decree of the Probate Court upon the executors' accounts provided that Maynard should be liable only for whatever portion of the sums of $43,600 added to the balance against the executors in their third account as principal, and of $13,516 added to the same balance as interest, as the beneficiaries under the trust may be unable to recover from Brigham and his sureties. This portion of the decree of the Probate Court was disaffirmed by the decree of the Supreme Judicial Court, and we think rightly disaffirmed. It is not germane to the present proceedings to attempt in such a manner to adjust in them the respective rights of Brigham and Maynard or of their respective sureties.

We see no reason to discuss further or in detail the several requests for rulings at the hearing in the Supreme Judicial Court, or the other questions raised by the different bills of exceptions and the appeals, further than we now have considered them.

The concluding sentence of the decree of the Probate Court upon the accounts of the trustee is this: "All investments of this trust fund in mortgages on real estate in the State of Kansas and in real estate there situated and the loan of $2,500 to the Commonwealth Loan and Trust Company are hereby disapproved." Taken in connection with the whole record we understand this to mean merely that the Kansas investments are held to have been unwarrantable investments making the trustee liable to the loss of $43,600 upon them as principal, and that it does not mean that the trustee cannot be allowed in respect to

them as principal the sum of $40,000 found to be their value when turned over to him as trustee. So construed we think the sentence quoted should stand as part of the decree.

The result is that the decrees of the Supreme Judicial Court upon the accounts of the executors and upon the accounts of the trustee are to be affirmed, and the exceptions are to be overruled.

*So ordered.*

HAMMOND, J. I dissent from so much of the foregoing opinion as holds Brigham answerable as trustee for the loss incurred in the attempted development of the land in Kansas.

The executors expended in that matter $81,100. The proceeds of this investment at the time they were delivered to the trustee were worth $40,000 and no more. The loss was therefore $41,100. I do not see upon what principle the trustee can be held answerable for this loss, or charged with the amount of it. He cannot be held upon the ground that he received it as trustee because he did not receive it. He cannot be held upon the ground that as trustee he made the investment or had anything to do with making it. The money was spent and the loss incurred by the executors; and so the court holds. No trustee was then in existence. He cannot be held upon the ground that by his receipt to the executors of October 2, 1890, he released them from their liability and so did an act inconsistent with his duty to the interests represented by him as trustee. The act is repudiated by the *cestuis que trust* and is declared invalid by the court. The liability of the executors stands as though the receipt had not been given. If, therefore, it be suggested that he failed in his duty to prosecute the executors, the answer is that the right of action against them and their sureties is precisely the same as before, and there is nothing to show that there has been any change in the situation to the detriment of the estate. Nor can he be held upon the ground that he has charged himself with the amount lost, because the theory upon which he has charged himself is rejected by the court. If it be suggested that this is a mere matter of accounting, the answer is that the amount found due from him as trustee is binding not only upon him but also upon the sureties upon his bond. *Bassett* v. *Fidelity & Deposit*

*Co.* 184 Mass. 210. In a word, the loss was made by the executors; and by no act or default of the trustee as such has the estate been damaged. And the theory upon which the trustee charged himself has been rejected.

Mr. Justice LORING and Mr. Justice BRALEY concur in this opinion.

The case was argued at the bar in January, 1903, before *Knowlton,* C. J., *Morton, Hammond, Loring, & Braley,* JJ., and afterwards was submitted on briefs to all the justices.

*J. Lowell,* (*G. McC. Sargent* with him,) for Frederick A. Brigham, trustee.

*H. C. Joyner,* (*T. H. Gage, Jr.* with him,) for Frederick A. Brigham, executor.

*W. Thayer,* for Herbert A. Maynard, executor, filed a brief.

*R. M. Morse,* (*C. E. Hellier* with him,) for Edith Rice Morgan and Edwin L. Rice, appellees.