EVERETT P. TURNER & another, executors, *vs.* JAMES H. MORSON, administrator.

Middlesex. April 5, 1944. — September 12, 1944.

Present: FIELD, C.J., LUMMUS, QUA, DOLAN, & WILKINS, JJ.

*Trust*, Sale of real estate, Occupancy of real estate, Upkeep of real estate, Consent of beneficiary. *Negligence*. *Trustee*. *Probate Court*, Report of material facts, Appeal.

A "report of material facts," filed by a judge of probate as the foundation for a decree after he had heard twelve accounts of an executor upon the report of an auditor who had heard eight of them, and "much" evidence, "some being a repetition of that heard by the auditor," was intended to be a complete statement of material facts and the equivalent of a report under G. L. (Ter. Ed.) c. 215, § 11, although it did not appear to have been filed in compliance therewith.

Upon a report of material facts by a judge of probate, without a report of the evidence, facts reported, except those appearing as mere inferences from subsidiary facts stated, must be taken to be true unless inconsistent with other facts found or with the pleadings.

Power given to executors, to whom was devised real estate, "in trust to sell," to postpone the sale thereof "so long as they may think proper," must be exercised with that soundness of judgment which follows from a due appreciation of trust responsibility.

Upon subsidiary facts found respecting the nature of certain land in Arlington with an outmoded house and outbuildings in a state of disrepair thereon, and the condition of the real estate market during the years 1931–1943, a conclusion was warranted that executors, to whom the property was devised "in trust to sell" with power to postpone the sale thereof "so long as they may think proper," were not negligent in failing to sell during that period.

Executors, with power to sell real estate which was devised to them "in trust" and included land and a dwelling house and outbuildings and which, after the loss of a tenant in 1934, had been occupied for nine years by one of them without paying rent, were properly found not chargeable for such use and occupation where it appeared that the dwelling house was outmoded and in a state of disrepair, that no tenant could have been found who would have paid rent, that, if the executor had not occupied the house, it would have deteriorated rapidly, and that his occupation was a benefit to the estate.

Consent by a beneficiary under a will, while living, to certain expenditures by the executor in maintenance and repair of real estate devised to the executor "in trust to sell" precluded the administrator of the beneficiary's estate from successfully contending that the executor should have been charged with such expenditures instead of credited.

A beneficiary under a will who did not appeal from a decree giving credit
to the executor for certain expenditures in maintenance and repair
of real estate devised to the executor "in trust" could not be given
direct relief from the decree although the administrator of the estate
of another beneficiary had appealed from the decree and the expendi-
tures were unwarranted in law; the nonappealing beneficiary, however,
benefited indirectly through a modification of the decree whereby,
while the decree retained the credits to the executor for such expendi-
tures made during the life of the appellant's intestate and with his
consent, credits for certain expenditures made before his death but
without his consent and after his death were disallowed.

Upon facts found, executors under a will with power to sell real estate
devised to them "in trust" were charged with certain expenditures
for maintenance of the real estate and renovation of an old, outmoded
dwelling thereon in a state of disrepair, because such expenditures were
made improvidently, although in good faith, to render the premises
attractive for purchase by some school or institution.

In a proceeding for allowance of an executor's account involving the pro-
priety of expenditures by him upon real estate devised to him "in
trust to sell," it was immaterial whether he obtained money to make
such expenditures by borrowing or, if so, whether he had authority
so to borrow.

PETITION for the allowance of twelve accounts of the exe-
cutors' of the will of Adelaide Turner, late of Arlington.

The case was heard by Poland, J.

H. R. Dolan (J. Saklad with him,) for the respondent.

P. A. Hendrick, for the petitioners.

LUMMUS, J. This is an appeal by James H. Morson,
administrator with the will annexed of the estate of Herbert
B. Turner, one of the residuary legatees and devisees under
the will of his mother, Adelaide Turner, late of Arlington,
from decrees allowing, after the disallowance of many items,
the first twelve accounts of Everett P. Turner and Howard
C. Turner, the executors of her will. The testatrix died
on August 27, 1931, survived by four children, Herbert B.
Turner, Marguerite Morra, and the two who were named
as the executors. Both before and after the death of the
testatrix Herbert lived in Spain and Marguerite in Italy.
But both were in Arlington from April until October in
1931, and Herbert was there again in the summer of 1933.
Herbert died on October 27, 1937.

The first eight accounts covered the period from the death
of the testatrix to the end of 1938. The controversy over

them was heard by an auditor, who filed a report. The last four accounts brought the accounting up to May 31, 1942. The judge heard all twelve accounts upon the auditor's report and "much" evidence, "some being a repetition of that heard by the auditor." The judge, on the same day on which the claim of appeal was filed, made a "report of material facts," in which he said, "Except as stated herein the court finds the facts to be the facts stated by the auditor whose report is made a part hereof." The judge discussed the charging of the accountants for use and occupation of a house by Everett P. Turner, and came to the conclusion, contrary to that of the auditor, that the accountants should not be charged therefor. In no other respect was the auditor's report affected. The report concluded as follows: "As to the ninth to twelfth accounts inclusive, not referred to the auditor, the court finds that, except as to the items disallowed, the expenditures charged in Schedule B were made by the accountants, were reasonably incurred and were properly paid."

There is nothing in the record to show that the "report of material facts" was required by the appellant under G. L. (Ter. Ed.) c. 215, § 11 (see c. 214, § 23), or was other than voluntary. The question arises, whether the report is to be deemed a complete statement of all the material facts upon which the judge based his decrees, just like a compulsory report under the statute (*Sidlow* v. *Gosselin,* 310 Mass. 395, 397; *Hinckley* v. *Barnstable,* 311 Mass. 600, 602; *Matter of Loeb,* 315 Mass. 191, 195), or merely a report of part of the facts in partial explanation of the decrees, without precluding the ordinary assumption that the decrees imported a finding of all facts, not expressly negatived, necessary to support them. *Birnbaum* v. *Pamoukis,* 301 Mass. 559. *Wilkins* v. *Berkeley Realty Corp.* 311 Mass. 148, 151. *Potter* v. *Great American Indemnity Co., ante,* 155. *Watkins* v. *Briggs,* 314 Mass. 282, 284. See also *Povey* v. *Colonial Beacon Oil Co.* 294 Mass. 86, 90; *Stern* v. *Lieberman,* 307 Mass. 77, 81, 82; *Lakeville* v. *Cambridge,* 307 Mass. 433, 437; *Munson* v. *Bay State Dredging & Contracting Co.* 314 Mass. 485, 489, 493; *Collins* v. *Common-*

*wealth,* 315 Mass. 167, 170; *Matter of Loeb,* 315 Mass. 191, 195, 196.  The report is entitled "report of material facts," and we think it was intended to be as complete and definitive as though made under the statute.  *Thaxter* v. *Traiser,* 305 Mass. 341.  *Druker* v. *Druker,* 308 Mass. 229.  *Quigley* v. *Quigley,* 310 Mass. 415.  *Plumer* v. *Luce,* 310 Mass. 789.

There being no report of the evidence, the facts reported by the judge, except those appearing to be mere inferences from subsidiary facts stated (*Charlestown Five Cents Savings Bank* v. *Kalemian,* 299 Mass. 599; *Gar Wood Industries, Inc.* v. *Colonial Homes, Inc.* 305 Mass. 41, 45; *Distasio* v. *Surrette Storage Battery Co., ante,* 133, 135), must be taken as true, unless inconsistent with other facts found or with the pleadings.  *Charlestown Five Cents Savings Bank* v. *Kalemian,* 299 Mass. 599.  *Wiley* v. *Fuller,* 310 Mass. 597, 599.  *Quigley* v. *Quigley,* 310 Mass. 415, 416.  *Colby* v. *Callahan,* 311 Mass. 727.  The question is whether the facts found support the decrees.  *Wiley* v. *Fuller,* 310 Mass. 597, 599.  *Thompson* v. *Thompson,* 312 Mass. 245, 246.  *Matter of Loeb,* 315 Mass. 191, 195.  The decrees must stand in the absence of error of law or fact.  *Coe* v. *Coe,* 313 Mass. 232, 234.

The testatrix, with her husband who died in 1907, lived in Arlington at 239 Pleasant Street, the much travelled main road from Arlington to Belmont.  She continued to live there until her death in 1931.  Both she and her husband took great pride in the maintenance at great expense of their gardens and grounds as a "show place."  After 1907 she did not improve the house or make more than the most necessary repairs, but she kept up the gardens and grounds and employed three men largely for that purpose.  The property has a frontage of five hundred sixty-three feet on Pleasant Street, and an area of one hundred two thousand two hundred sixty-seven square feet.  A rocky ledge sixty feet deep covers the back of the property, reducing the usable part to a strip one hundred feet deep along the street.  Even in that strip the surface soil is very shallow, and there are many outcroppings of the underlying ledge.  No house could be built there without blasting for the cellar and for drains

and service connections. The property is situated in an excellent neighborhood principally of large single family dwellings. Zoning regulations require single family dwellings set back twenty-five feet from the street on a lot at least sixty feet wide. Across the street is a smaller vacant lot of less than ten thousand square feet, bought before 1907 to afford a view of Spy Pond from the larger lot on which the buildings are located. Together they constituted the homestead estate of the testatrix.

On the large lot already described is a large old fashioned wooden house with large piazzas and twelve high studded rooms, built about 1850 in the style of that period. The floors were of soft pine, and the lighting fixtures were designed for the use of both gas and electricity. The bathrooms and the kitchen and pantries were old fashioned. The design of the house precluded successful remodeling. There is a large stable that had been made over into a garage for automobiles to the extent of cementing part of the floor. There are sleeping quarters upstairs, unused during the period of these accounts, for a coachman or chauffeur, and in them is a very old and inadequate bath. There is a large unattractive greenhouse reached through the kitchen, but its heating plant was out of order long before the death of the testatrix.

When the testatrix died the house was assessed for $8,000, the stable for $3,500, the greenhouse for $1,000, and the large lot for $15,500, a total of $28,000. The inventory value was $27,000, made up as follows: the house was valued at $10,000, the stable (called garage) at $3,000, the greenhouse at $1,000, and the large lot at $13,000. The smaller lot across the street was assessed for $2,100, and inventoried at $1,000.

Apart from certain household furniture and personal effects divided among her children, the testatrix disposed of her estate as follows. She gave to various persons legacies aggregating $8,000. She divided the residue of her personal property among her four children. She devised all her real estate to her executors in trust to sell and dispose of the same (with power to postpone such sale and disposition as

to any or all of the said real estate so long as they may think proper; and to pay over and transfer the proceeds thereof to my children living at my death." She provided that "My executors may postpone the distribution of such part of my personal estate as they may consider necessary for paying the taxes and other expenses of keeping up my real estate pending a sale or other disposition thereof and may apply the same or the proceeds thereof or the proceeds of any such real estate to such taxes and expenses of upkeep."

After paying the debts, which were small, and the legacies, and a distribution in money of $2,500 each to the four children, the executors had left at the end of 1931, according to their first account, only household effects valued at $7,204, and cash and securities valued at $7,286.26, besides the real estate. The household effects, valued at $7,204, were divided amicably among the four children, and the amount was written off as a distribution on December 28, 1933. Later, distributions amounting approximately to $1,100 to each of the children were made in money. It seems obvious that the testatrix must have had a much greater income than the size of her estate would indicate, and there are signs in the record that both the testatrix and her husband established trust funds, the extent and purposes of which do not appear.

The appellant seeks to charge the executors (1) for failure to sell the real estate, (2) for allowing Everett R. Turner, one of the executors, to occupy the house without paying rent, (3) for spending money on the house and grounds, and (4) for borrowing money to spend on the house and grounds.

1. The real estate market had reached its peak in 1926 and, thereafter, fell off gradually both as to market values and buying demand until the summer of 1932, when "the bottom dropped completely out." On September 28, 1931, when the executors were appointed, and thereafter until the summer of 1932, it was not generally foreseen or foreseeable that a great break in the real estate market would occur. The whole homestead estate could not have been sold in 1931 for more than $17,000, and it is inferable that that price would have seemed small to all the children.

After the servants left early in 1932, the house remained

vacant until August, 1932, when a tenant was found who paid $150 a month as rent. The tenant insisted that the signs of several brokers with whom the property had been listed for sale be taken down. The brokers had obtained no offer for the property, and personal efforts by the executors obtained none. The tenant died, and the tenancy ended on October 31, 1934. Again the house became unoccupied.

After the collapse of the real estate market in the summer of 1932, it would have been impossible to sell the property for any purpose or at any price until 1935, when the market improved slightly. In 1936 the market became active for vacant land adapted for low priced houses, which the property in question was not. In 1937 the market again "dropped out of sight" until the latter part of 1938 when it improved for land adapted for low priced houses. In 1938 the property could not have been sold for more than $15,000.

The auditor came to the conclusion, approved by the judge, that there was no negligence in the failure to sell the property. The auditor filed his last report on July 29, 1941, and the judge filed his report of material facts on April 30, 1943. No evidence is reported, and all we know of the real estate market is found in the auditor's report. It does not appear that any of the persons interested ever pressed the executors to make a sale. On various occasions the testatrix had expressed to all her children her desire that the property be "kept up" as it had been during her life until sold, and that, if possible, it be sold "to some one who would appreciate it." *Brigham* v. *Morgan*, 185 Mass. 27, 38. None of the children then or later ever expressed any disagreement with that desire.

No doubt the power given to the executors to postpone the sale of the real estate "so long as they may think proper" had to be "exercised with that soundness of judgment which follows from a due appreciation of trust responsibility." *Corkery* v. *Dorsey*, 223 Mass. 97, 101. *Boyden* v. *Stevens*, 285 Mass. 176, 179. *Cronan* v. *Cronan*, 286 Mass. 497, 500, 501. *Old Colony Trust Co.* v. *Rhodes*, 299 Mass. 390, 397.

*Berry* v. *Kyes*, 304 Mass. 56, 59. *Damon* v. *Damon*, 312 Mass. 268, 272. But putting ourselves in the position of the executors it is hard to select a time when we can say that the executors were negligent in failing to sell. There was always the hope that some institution that could use the buildings would buy the property as a whole. To any other buyer the buildings apparently were worthless. Without the buildings the property would consist of very inferior building lots, though in a good neighborhood. On the whole we cannot say that the judge was wrong in declining to charge the executors with liability for their failure to sell the real estate.

2. After the house had been vacant since October 31, 1934, Everett P. Turner, the "managing executor," moved into the house with his family in August, 1935, renovations having been made. He paid no rent. The auditor found as follows: "I do not find that the renovations were made with the specific purpose of providing Everett with a home; but because the executors thought they would sufficiently enhance the chances of selling the house to justify the expenditure." He found further: "All the children knew that the renovations were to be made and that Everett was to live there till the place was sold, and they knew this program had been put into effect. There is no evidence that Herbert or Marguerite knew how much was to be spent or whether Everett paid rent, or, if so, how much. Neither showed any interest or made any inquiries, suggestions, or complaints." No effort was made thereafter to rent the house.

The judge found that no express or implied obligation on the part of Everett to pay rent was established. He found that no tenant could have been discovered who would have paid rent, that if Everett had not occupied the house it would have deteriorated rapidly, and that his occupation was a benefit to the estate. The judge charged against the executors some items of expense that were for the personal benefit of Everett in making the house more conveniently habitable by him. But we think the judge was right in not charging the executors for the use and occupation by Everett.

518. The testatrix became indifferent to the inside condition of the house, and left it in bad repair. The possibility of a sale to an institution depended upon keeping the house in salable condition. While the house was let to a tenant it had to be kept in repair. When the tenant died the executors were confronted with the problem of a vacant house, hard to sell, and a depressed real estate market. They decided the wisest course was to fix it up at reasonable cost inside and out, using old John [a gardener and choreman] and A. C. Hill [brother-in-law of Everett P. Turner] for the work as far as possible. The house was so outmoded that its sale without renovations and modernizations to the extent of new bathrooms and lighting fixtures, and some hardwood floors, seemed most unlikely. The executors acted in good faith. They thought that if they were patient and fixed up the property a buyer could be found. In the spring of 1935 both executors and their children worked on the place weekends. The amounts spent for the work were reasonable for what was done. Much more work might easily have been done, but it was confined to what the executors believed essential to a sale." Upon the foregoing facts, the auditor found that the executors should be allowed for the expense of care, maintenance, repair and renovation of the house, with certain specified exceptions. The judge made no finding on this subject, except to adopt the finding of the auditor. ... As to the grounds, the auditor reported that "Beginning in the spring of 1932, only the front of the place was kept up, and the extensive gardens on the terraces and back part of the land were discontinued, and in 1935 many of the larger gardens in the front of the premises were sodded down. The greenhouses were discontinued in 1932 or 1933 except for growing annual seedlings. The men employed about the premises were reduced on May 6, 1933, to one, John Millrick, who was paid $25 a week. Later, in August, 1937, after Millrick had ceased to be employed, one A. C. Hill, a brother-in-law of Everett P. Turner, was employed at sixty cents an hour." ... The auditor found: "The executors believed it the wisest

course to maintain an attractive appearance of the property, thinking it might find a market for a school or institution They could have kept the place neat and tidy, with the shrubbery and lawns in condition (omitting all gardens) through the use of itinerant choremen at a cost not exceeding $400 a year. The higher standard of appearance decided upon did not enhance the value of the property, and had little or no effect in its salability."

After the tenant died in the fall of 1934, and the house was left vacant, ordinary business judgment should have told the executors that their problem was one requiring careful and thrifty conservation of their assets, lest the expenses of the real estate consume the whole trust estate and leave nothing for the beneficiaries. They had a large, old, and outmoded house, of a kind that few, if any, individuals would buy as a residence at any price. If the house were torn down, they would have left only a tract of inferior and undesirable building land. The only substantial chance of getting anything for the buildings was to find some school or institution that could use them. That was a hope rather than a reasonable expectation, and one that might be deferred for many years and very likely forever. The auditor found that "The house was so outmoded that its sale without renovations and modernizations to the extent of new bathrooms and lighting fixtures, and some hard wood floors seemed most unlikely." Common experience, we think, shows that its sale with such renovations and modernizations at a price that would repay the cost of them was still more unlikely. The auditor found that the executors "thought that if they were patient" and fixed up the property "a buyer could be found," and that they "acted in good faith." Of course it was prudent for them to keep the buildings painted, and wind and water tight. But an institution such as constituted their only likely or even possible customer doubtless would have its own plans for remodeling and modernization to suit its own peculiar needs. Modernizing the house in advance would probably be a waste of money, adding little to the market value. Coe v. Coe, 313 Mass. 232, 234. Home v. The course taken by the executors indicated that they

had little appreciation of their responsibility or their situation.   That is shown by their expenditure of $5,958.04 for plainly unnecessary and improper items that the court below disallowed, besides other items that were allowed below and are still in controversy.   From the beginning their expenditures were lavish and wasteful.   In the winter of 1934 and the spring of 1935 extensive renovations were made in the house in anticipation of occupancy by Everett.   For the most part, such renovations were made improvidently.   As to many of their acts, the executors can escape liability only because of the consent of their brother Herbert, whose estate the appellant represents.

Herbert was in Arlington from April until October, 1931, and apparently again in the summer of 1933.   He must have seen in a general way that the grounds were being kept up as they were in the lifetime of the testatrix, and that the same men were being employed without reduction in their number.   He with the other children agreed in 1931 that the property should be "kept up" until sold.   None of them ever expressed any change of mind.   Herbert knew that renovations were planned in 1934 and 1935 and that Everett was to move in when they were completed.   He never asked the details or the probable cost.   Apparently he neither asked nor received any accounting.   He showed no interest, and made no inquiries, suggestions or complaints.   To the extent that he consented to acts of the executors, he could not complain of them if he were living, and neither can the appellant, who stands in his shoes.   *Lannin* v. *Buckley,* 256 Mass. 78, 82.   *Matthews* v. *Thompson,* 186 Mass. 14, 19. *Ashley* v. *Winkley,* 209 Mass. 509, 529.   *Malden Trust Co.* v. *Brooks,* 291 Mass. 273, 283.   Scott, Trusts (1939) §§ 216–219.   Loring, Trustee's Handbook (5th ed. 1940) § 100.

Consent of Herbert could not affect directly any right of Marguerite.   Scott, Trusts (1939) § 216.2.   But Marguerite did not appeal, and this court has no duty or right to give her directly relief that she could have obtained by appealing. *Coe* v. *Coe,* 313 Mass. 232, 234.   Herbert's representative is the only appellant, and the decrees can be revised only

so far as they infringe his rights. *Braga* v. *Braga*, 314 Mass. 666, 673. But since Marguerite is entitled to an equal share in the trust estate with Herbert and his representative, she will benefit indirectly from the disallowance of expenditures that may result from our decision on this appeal. See *Little* v. *Little*, 161 Mass. 188, 203; *Bennett* v. *Pierce*, 188 Mass. 186; *Merchants Discount Co.* v. *Federal Street Corp.* 300 Mass. 167, 173.

There is difficulty in separating the allowable expenses from those that should be disallowed. There is further difficulty in separating the expenditures to which Herbert consented from those to which his consent did not extend. But deciding the questions of fact as best we can on the record, it seems to us that the expenditures allowed by the court below up to October 31, 1934, when the house ceased to be rented, were covered by Herbert's consent. Coming to the renovations of 1934–1935, the finding of the auditor that the expenditures therefor, with certain exceptions, were proper credits to the accountants, was expressly based solely upon subsidiary findings. Therefore the proper inferences from those subsidiary findings are open to our decision. We think the removal of bookcases and the laying of hard wood floors, at an expense of $371.65, should be disallowed.[1] We think the installation of modern bathrooms and the modernization of the plumbing, at an expense of $533.89, should be disallowed.[2] The item of $428.84 for renovating the water system in the stable or garage[3] should be disallowed. Although the town authorities required the work, if the garage were to have water, there was no good reason for water in a practically unused building. Any consent of Herbert of course expired at his death. Thereafter the executors paid for labor in caring for the property sums exceeding the sum of $400 a year, which sum we consider reasonable for the occasional labor required. The result is

---

[1] Fifth Account, January 28, 1935, $79.86; April 10, 1935, $32.40; May 20, 1935, $83.30; July 8, 1935, $85.10; August 13, 1935, $10.39; November 1, 1935, $80.60.

[2] Fifth Account, January 14, 1935, $21.09; April 17, 1935, $210.27; July 5, 1935, $139.23; August 13, 1935, $7.65; November 6, 1935, $155.65.

[3] Seventh Account, May 18, 1937, $428.84.

to charge the executors with the sum of $2,081.18.[1] In all the executors are to be charged with the sum of $3,415.56, in addition to the $5,958.04 with which they were charged by the court below.

4. Early in 1932 the executors began to borrow from the trustees of the estate of their father, Edward C. Turner, such sums as they thought desirable for the maintenance of the property in the style to which they were accustomed. Unfortunately the trustees, whoever they were, were willing continually, and in large amounts in the aggregate, to lend without apparent consideration of the likelihood of repayment. The same four children were the beneficiaries of the Edward C. Turner estate.

In June, 1932, the executors obtained a loan of $5,000 from a savings bank, secured by mortgage on the property. The mortgage was given under a license from the Probate Court to mortgage to pay debts of the deceased. Out of the proceeds of the mortgage the executors repaid a loan of $500 made to them by one Symonds on May 31, 1932, and loans aggregating $1,400 made to them by the trustees of the Edward C. Turner estate prior to November 1, 1932. The mortgage has never been discharged or reduced.

The executors continued to borrow large sums from the Edward C. Turner estate: $952.50 in 1933, $1,583.35 in 1934, $6,997.70 in 1935, $3,085 in 1936, $4,138.96 in 1937, $2,295.11 in 1938, $3,148.50 in 1939, $3,201.26 in 1940, and $2,876.48 in 1941, a total of $28,278.86, only a trifling part of which has been repaid. Besides, the securities once held have been consumed. All the borrowings except from the savings bank were without interest.

The appellant raises the question whether the executors had authority to borrow money. Their express powers under the will were to "sell and dispose of" the real estate, and to "postpone such sale." Nothing was said about mortgaging or borrowing. *Tuttle v. First National Bank,* 187 Mass. 533. *Warren v. Pazolt,* 203 Mass. 328, 349-351.

[1] 1349 Ass. 530; July 8, 1902; Aug. 12, 1903; 912.07 November 1.

[2] Total amounts paid for such labor in the periods of the several accounts after the death of Herbert were as follows: Eighth Account (1938) $1,180.54; Ninth Account (1939) $936.78; Tenth Account (1940) $882.86; Eleventh Account (1941) $681.

*Reggio* v. *Warren*, 207 Mass. 525. *Dunham* v. *Blood*, 207 Mass. 512. *Williams* v. *Dugan*, 217 Mass. 526. *Sanger* v. *Farnham*, 220 Mass. 34, 37. *Malaguti* v. *Rosen*, 262 Mass. 555, 561. *Ames Family School Association, Inc.* v. *Baker*, 273 Mass. 119. *Jones* v. *Swift*, 300 Mass. 177, 182, 183. Scott, Trusts (1939) §§ 191.3, 191.4. That question is beside the point, for no one is seeking now to enforce any obligation against the trust estate.

The real question in this case is whether the questioned expenditures were either proper or consented to by Herbert, so that the appellant cannot object to them. If they were either, the executors are entitled as against the appellant to be allowed for them in their accounts, and to reimburse themselves for them out of the trust property. *King* v. *Stowell*, 211 Mass. 246. *Hallett* v. *Moore*, 282 Mass. 380, 393, 396, 397. *Downey Co.* v. *282 Beacon Street Trust*, 292 Mass. 175. *Anglo-American Direct Tea Trading Co.* v. *Seward*, 294 Mass. 349, 351. Scott, Trusts (1939) §§ 244–246. Compare *Jones* v. *Swift*, 300 Mass. 177, 182, 183. Whether the executors obtained the money with which to make the expenditures out of the assets of the trust, or out of their own pockets, or by borrowing it, is immaterial, in the present case. Apparently enough expenditures have been allowed to exhaust the trust property.

The decrees appealed from are to be modified in accordance with this opinion, and as modified are affirmed.

*So ordered.*