JOSEPH LIPSITT, administrator, & another, *vs.* PATRICK SWEENEY & another, trustees, & another.

Bristol.    October 23, 1944. — February 9, 1945.

Present: FIELD, C.J., LUMMUS, QUA, RONAN, & SPALDING, JJ.

*Trust,* Express trust: construction; What property held in trust; Spend-thrift trust; Termination of trust; Distribution; Consent of beneficiary. *Estoppel. Executor and Administrator,* Consent of decedent. *Probate Court,* Master: objections to report. *Words,* "Estate."

A declaration of trust, made by the widow and one of five children of an intestate, following a deed to them by the four other children of all their interest in the real and personal estate formerly of the intestate, effectually subjected to the trust the entire interest of everyone in the property left by the intestate by using the description, "the real estate and personal estate of which" the intestate "died seised and possessed or to which he was entitled at the time of his decease, being the same real estate and personal estate which was conveyed to us by" the four children "by deed . . . to be recorded herewith."

Provisions of a trust instrument making payments to certain beneficiaries subject to the discretion of one of the trustees, and that, if at the time set for final distribution any of the named beneficiaries should have died, "his or her share is to be transferred to his or her estate . . . and not to any purchaser thereof," did not qualify the right of the beneficiaries to distribution at the time set therefor or their right at that time to convey their distributive shares to new trustees upon a new trust without formal distribution from the old trust.

Reasonable findings by a master, made upon unreported evidence and not inconsistent with documents included in his report, that where, at the termination of a family trust, the trustee conveyed all the trust property to new trustees upon a new trust for the same main purposes and the beneficiaries of the first trust joined in such conveyance and released all their interest in the property, there was in substance an agreement among themselves with the trustee of the first trust that,

instead of insisting upon their rights to a formal distribution under the first trust, they would create the second trust and accept their interests thereunder in full satisfaction of their distributive shares under the first trust, showed that the first trust and the rights of the beneficiaries thereunder were thereby terminated.

Upon findings by a master, certain payments by and conduct of trustees of a friendly family trust with the knowledge and acquiescence of all beneficiaries were not open to attack by administrators of the estates of certain of such beneficiaries who had died thereafter.

Objections to a master's report not brought in to the master but filed in court after the filing of his report were futile under Rule 32 of the Probate Courts (1934).

PETITION IN EQUITY, filed in the Probate Court for the county of Bristol on September 5, 1941.

The case was heard by *Hitch*, J.

*R. M. Blake*, (*J. Lipsitt* with him,) for the petitioners.

*T. F. O'Brien*, for the respondents.

QUA, J.   This petition in equity was brought by the administrator of the estate of Mary W. Nickelson, late of New Bedford, and is now prosecuted by him and by an intervening petitioner, Frederick C. Brown, administrator of the estate of Annie M. Brown.   Its primary purposes are to secure an accounting by the respondent Patrick Sweeney of his administration of a trust of which he became surviving trustee, hereinafter called the first trust, and also to secure an accounting by the respondents Patrick Sweeney and Ellen C. Sweeney of their administration of a later and closely related trust, hereinafter called the second trust, and to obtain payment to the petitioners of balances which they claim to be due to the estates of their respective decedents because of alleged breaches of trust and in distribution of both trusts.   The facts have been found by a master.   The judge of probate entered a final decree dismissing the petition, wherein he found and recited, among other things, that "If the trustees in any particulars departed from the exact terms of the written trusts it was with the consent and acquiescence of all interested parties," and that "the petitioners' intestates, or their legal representatives, have received all they are entitled to under said trusts."   The administrators appeal from a decree confirming the master's report and from the final decree.

Daniel Sweeney, late of Dartmouth, died in December, 1916, leaving a widow, Mary Sweeney (since deceased), and five children, Patrick Sweeney, Mary Nickelson (whose estate is represented by the original petitioner), Ellen C. Sweeney, Joanna Sweeney, and Annie M. Sweeney (later Brown, whose estate is represented by the intervening petitioner). Joanna has intervened as a respondent. The parties to the petition are therefore all the living children of Daniel Sweeney and the legal representatives of deceased children.

Daniel Sweeney left an estate which inventoried (after correcting a slight error) at $27,850 for real estate and $3,374.57 for personal property. The real estate consisted of a farm in Dartmouth where all the family, except Mary Nickelson, who was married, then lived and of several other tracts of land in Dartmouth and in New Bedford. The widow and four children continued to live as a family on the farm until the death of the widow in 1921. She operated the farm under an arrangement with a former employee of her husband and "ran the home." The four children who lived there paid no board, and Mrs. Nickelson, who did not live there, received from time to time sums of money from her mother which were derived from the property left by Daniel Sweeney. After the death of the widow, the four children who still lived together moved to New Bedford and occupied a house purchased in part with funds derived from the property left by Daniel Sweeney. The foregoing outline of the family situation has been inserted in order to show the relationships of the parties interested in the two trusts. The family background undoubtedly had much to do with the creation of these trusts and with the provisions of the instruments by which they were manifested. All parties interested in the trusts were on friendly terms as long as they lived. It does not appear that any of the beneficiaries while living objected to anything that the trustees did or omitted to do, and the master's report is replete with findings showing in general their knowledge of what was going on and their consent thereto. The findings of the master must be con-

sidered, and the terms of the trusts must be interpreted, with this background in mind.

The first trust was created October 2, 1917. It took the form of a conveyance from the four daughters to their mother and their brother Patrick of all their interest in the real and personal estate formerly of Daniel Sweeney and of a declaration by the mother and Patrick that they held the property in trust for various stated purposes, among them being to pay all debts and claims against the estate of Daniel Sweeney, to sell and invest the property, and upon termination of the trust, if the widow should not be living, to distribute the fund equally among the children or their estates. The trust was to terminate five years after the death of the widow, unless sooner terminated by the trustees. This trust was adapted to secure the continued management of the family property as a unit, as it had been when owned by Daniel Sweeney, and to provide a method for the gradual and advantageous sale of the real estate of which the property principally consisted. It is reasonable to suppose that these were the motives which led to the creation of the trust.

The period of five years after the death of the widow expired in September, 1926, but by the acquiescence of all parties this first trust was allowed to run on, with Patrick as surviving trustee, until December 20, 1928, when the second trust came into being. On that day Patrick Sweeney as trustee under the first trust, and individually, conveyed to one Clarke all the real estate formerly of Daniel Sweeney and remaining undisposed of. The four other children of Daniel, being, with Patrick, all the then beneficiaries of the first trust, joined in the deed, directing Patrick to give it and releasing all their right, title, and interest in the land. On the same day Clarke conveyed the same land (except one lot sold to him) to Patrick Sweeney and Ellen C. Sweeney as trustees upon terms set forth in Clarke's deed. This was the second trust. Its terms differed in many matters of detail from those of the first trust, but its general purposes seem to have been the same, and it provided for distribution of the fund

among the same five beneficiaries at the expiration of ten years.

We can now take up the several objections still pressed and argued by the petitioners as reasons for upsetting the account as settled by the master and the decree of the court.

1. It is urged that the first trust as declared by the widow and Patrick included only the property conveyed to them on the same day by the four daughters, and that it did not include the widow's and Patrick's own shares in the estate of Daniel Sweeney. The declaration of trust describes "the real estate and personal estate of which Daniel Sweeney, late of said Dartmouth, deceased, died seized [*sic*] and possessed or to which he was entitled at the time of his decease, being the same real estate and personal estate which was conveyed to us by . . . [the four daughters] by deed . . . to be recorded herewith." We think it clear that the descriptive words "the real estate and personal estate of which Daniel Sweeney . . . died seized" control over the immediately following reference to the same estate conveyed by the four daughters. The word "estate" is used as describing the lands themselves and the items of personal property included in the trust and not as describing the undivided interests therein of particular persons. See *Leland* v. *Adams*, 9 Gray, 171, 175. In this sense the real and personal estate declared to be in trust would be the same as that conveyed, even if the interests of the widow and Patrick are included in the trust. It is not reasonable to suppose that the parties would set up a trust like that here declared largely for the purpose of selling real estate and would put into it only the undivided shares of the four daughters, amounting to eight fifteenths of the whole, and yet would make the widow and son beneficiaries in the same proportions as if their undivided shares of five fifteenths and two fifteenths respectively had been included. The trust covered all the interests of all the heirs of Daniel Sweeney.

2. Next it is argued that the first trust was a spendthrift trust because of provisions making payments to the

widow and daughters subject to the discretion of Patrick Sweeney and because of a provision that if any of the children should have deceased at the time for final distribution "his or her share is to be transferred to his or her estate . . . and not to any purchaser thereof," and therefore that the beneficiaries who were to be protected could not make a valid transfer of their interests under the first trust into the second trust. There is nothing in this point, even if we assume that these provisions really are spendthrift provisions and that they are valid. There had been no previous assignments by any of the beneficiaries. All the beneficiaries were alive when the time for distribution arrived at the expiration of five years after the death of the widow. From that time on it was the duty of Patrick as surviving trustee to pay the several distributive shares to the distributees whenever they desired him to do so. Their rights to receive their shares were absolute when they turned them into the second trust as hereinbefore narrated. They were not then subject to any spendthrift clause. The distributees could compel distribution and payment. If they had done so and had received their money, they could have put it into the second trust. They were not obliged to go through that useless form. Scott on Trusts, § 153.1.

3. It is contended that the creation of the second trust did not terminate the first trust, and that the first trust should have been treated as continuing to exist. Some pertinent findings of the master are these: "During the period covered by the first trust the personal property left by Daniel Sweeney had been converted into cash and while this money had been mingled with receipts from rents and sales of real estate and farm income, the disbursements were in excess of the personalty and the funds on hand at the time the second trust came into being may properly be deemed to have been real estate." "Thus when the conveyance of real estate was made to Atty. Clarke by Patrick and the four daughters of Daniel Sweeney for the purpose of a new declaration of trust, there was no personal property remaining in the first trust to be ad-

ministered." " . . . the conveyance to Clarke by Patrick
and his four sisters was equivalent to a release of their
beneficial interests in this first trust." "The petitioners
claim that this trust was never legally terminated even
though it was ripe for termination by the surviving trustee.
I do not so find." Instead of going through the formality
of distributing the first trust and then creating the second
trust, "everyone joined in releasing all their right, title
and interest in the property still held by the surviving
trustee for the purpose of creating a new trust for mutual
benefit." " . . . the conduct of the parties warrants the
finding that all knew that the first trust was at an end,
that the second trust was being created, and that the
credits and debits under the first trust would be applied
to the respective shares under the second trust. It was a
friendly family- arrangement, wholly fair and reasonable
and designed to get the most out of the property which
had come to them from their father and mother." All
parties having any possible interest in the first trust could
make " . . . such new arrangement as they deemed advis-
able. The conveyance of the remaining real estate to
Atty. Clarke was obviously intended to dispose of the
interests of all parties in the first trust and it would serve
no useful purpose to attempt to keep the first trust alive
on the ground that some small item of personal property
might not have been distributed or expended, particularly
when all parties acquiesced for several years in the manner
in which the second trust was being operated." "I find
that the conveyance to Atty. Clarke by all the interested
parties was a valid release of all their right, title and interest
under the first trust."

Whatever might be the interpretation of the first of these
findings if it stood alone, we are of opinion that, consider-
ing all the findings in the light of the family character of
the entire transaction and of the harmony that prevailed
among all the children, the master intended to find and did
find that all the then beneficiaries of the first trust agreed
among themselves and with the surviving trustee that in-
stead of insisting upon their rights to a formal distribution

of the first trust they would create the second trust and
would accept their interests as beneficiaries in the real
estate under the second trust as full satisfaction of their
distributive shares in the property held in the first trust.
We think that this is a finding resting upon all the evi-
dence before the master and not merely upon a construc-
tion of the documents. It seems to us a reasonable finding,
and we see nothing in the documents inconsistent with it.
See *Matthews* v. *Thompson*, 186 Mass. 14, 18–19; *Commis-
sioner of Corporations & Taxation* v. *Second National Bank*,
308 Mass. 1, 11. The first trust was therefore terminated.
None of the parties can now object to a method of distrib-
uting the trust fund to which they or their intestates all
agreed in 1928 and to which none has made any objection
until now. *Partridge* v. *Clary*, 228 Mass. 290. Scott on
Trusts, § 342. The case is distinguishable from *Whitney* v.
*Whitney, ante*, 253, where the court refused to enforce lia-
bility upon a contract by which the plaintiff was to profit
personally at the expense of his fiduciary obligation under
a trust the purposes of which had not been accomplished.
See *Ames* v. *Hall*, 313 Mass. 33, 37.

4. It is contended that Patrick Sweeney should be
charged with several alleged breaches of·trust during the
period while the first trust was in force; but if we assume
without deciding that the formation of the second trust did
not in itself constitute a release from any then existing lia-
bility for previous breaches of the first trust, still a sufficient
answer to each of these claims is that in each instance the
intestates of the parties who are now finding fault with
what was done had full knowledge of it at the time and
consented to it, and now their representatives are estopped
from objecting to it. *Poole* v. *Munday*, 103 Mass. 174.
*Pope* v. *Farnsworth*, 146 Mass. 339, 344. *Preble* v. *Green-
leaf*, 180 Mass. 79. *Lannin* v. *Buckley*, 256 Mass. 78, 82.
*McInnes* v. *Whitman*, 313 Mass. 19, 27. *Turner* v. *Morson*,
316 Mass. 678, 688. We deal more specifically with the
findings relating to these contentions in paragraphs (a) to
(c) next following.

(a) When after the death of the widow all the children

except Mrs. Nickelson, who did not live at home, desired to move from Dartmouth to New Bedford, a house was purchased for them to live in. The title was taken in Patrick's name, but $6,000 of the purchase price came from trust funds and was charged to Patrick as part of his distributive share. The complaint as to this item seems to be that Patrick received this sum ahead of time and should pay interest on it. See Scott on Trusts, § 255. But the master finds that "all parties knew about it and acquiesced and it may be inferred that no one expected interest would be paid."

(b) During the lifetime of the widow, "some . . . $3,000 dollars are unaccounted for." This was paid out by the widow at a time when she was managing the home. She "gave small gifts from time to time to her children and perhaps to others." Apparently Mrs. Nickelson received some of this money. Not only did the declaration of trust provide that the widow should receive such sums as Patrick Sweeney should recommend, and he consented to the payments that made up the $3,000, but also it is plain from the findings that all the children allowed their mother, who was then one of the trustees, a large discretion in handling the family cash. The $3,000 amount "was all talked over and everyone acquiesced in everything she [the widow] did." ". . . if no strict account was kept of what she took, everyone was satisfied with her management . . . ." "There was complete harmony among all the Sweeneys and everyone knew what was going on." "So when Mrs. Sweeney took from the trust such amounts as served her purpose and with the recommendation and consent of Patrick she was well within her rights. The record of just what she took and how she disposed of it is far from complete, but the acquiescence of all parties in this arrangement bars any criticism or objection at this late day."

(c) The sum of $1,500 was paid to the daughter Ellen in repayment of loans made by her to her father, Daniel Sweeney, in 1893, 1910, and 1913. It is contended that these loans were outlawed and therefore not "debts and claims against the estate of said Daniel Sweeney" which by

the declaration of trust the trustees were directed to pay. But whether or not this direction included outlawed claims, the findings are ample to show that all persons interested assented to the payment. They all knew about it. No one objected. The master allowed the item. The inference reasonably to be drawn from the findings in the peculiar circumstances in which this trust was operated is that all consented. We draw that inference, as apparently the judge of probate also did.

5. Mention is made by the petitioners in argument of some unsold land at "the Cove" which, according to the master, was "set off" to Patrick and Ellen for $5,000 and charged against their distributive shares in the second trust. The master finds that the other beneficiaries were "well cared for" in this transaction; that no advantage was taken of them; that they were fully advised of all that was done by the trustees, made no objection in their lifetimes, and by deed released all claim upon the property. There was no evidence of fraud or deception ". . . there appears to be no reason to question these sales . . . ." The master says that he assumes that all parties knew the details. An inference to that effect seems proper, as does also an inference that all parties assented to what was done.

6. We see no reason why the trustees, having faithfully administered the trusts, should not be allowed the compensation of $100 a year each which they have sought and which the master has found to be reasonable.

7. We see no objection to the allowance in the account of a credit to the trustees of $1,249.91 for services of an accountant. The master found this amount reasonable. *Loring* v. *Wise*, 226 Mass. 231, 234–235.

8. Certain questions have been argued as to the admissibility of evidence received by the master, but these questions do not appear to be open for the reason that no written objections were brought in to the master and appended to his report as required by Rule 32 of the Probate Courts (1934). The filing of these objections in court after the filing of the master's report was futile. *Commissioner of Banks* v. *Tremont Trust Co.* 267 Mass. 331, 335–337. *Bou-*

*chard* v. *Bouchard*, 313 Mass. 531, 535.   We do not inti-
mate that there was any error in admitting this evidence.

In our opinion there was no error in the manner in which
the Probate Court dealt with the case.

*Decrees affirmed.*