GEORGE F. HALL & another, trustees, *vs.* ELINOR WAY EVANS & another.

Norfolk.    October 6, 1950. — January 11, 1951.

Present: QUA, C.J., LUMMUS, RONAN, SPALDING, & WILLIAMS, JJ.

*Trust*, Trustee's accounts, Loss, Use of principal, Investments.

There was no error in a decree allowing an account of testamentary trustees showing a substantial loss on shares of stock received by them from the executor of the will in a corporation of which the testator had been substantially the sole owner, where it appeared that, after the corporation had agreed to sell all its assets for a price payable in instalments, the trustees caused certain of the instalments, as received by the corporation, to be paid by it directly to the testator's widow in order to carry out provisions of the will directing them to provide her a certain sum annually during her life and authorizing them to use principal of the trust for that purpose so far as necessary, instead of causing the corporation to pay such instalments to them as liquidating dividends on the shares and so as principal of the trust and themselves paying the amounts thereof to the widow; that the loss shown in the account upon full liquidation of the shares through completion of payment of the purchase price and dissolution of the corporation was due to the fact that the amounts of such instalments were not reflected in the account; and that, although "the method of accounting used by the trustees was irregular and subject to criticism," they acted in good faith and the trust remaindermen suffered no damage.

Evidence did not show to be plainly wrong a finding that trustees under a will, holding shares of stock received from the executor in an inactive

corporation of which the testator had been substantially the sole
owner and which itself owned shares in a competitor corporation,
exercised good judgment in not dissolving the first corporation until
about twenty years after the testator's death, during the earlier part
of which period the competitor corporation was paying the first cor-
poration rent for use of all its property and during most of the later
part of which period the competitor corporation was paying the first
corporation by instalments the purchase price under an agreement to
purchase such property.

PETITION for allowance of an account, filed in the Probate
Court for the county of Norfolk on October 8, 1947.

The case was heard by *Reynolds*, J.

*J. H. Ramsey*, for the respondents.

*A. I. Burgess*, for the petitioners.

WILLIAMS, J. This is an appeal from a decree allowing
the first account of George F. Hall and Thomas S. Burgin,
trustees under the will of Frank S. Patch, late of Quincy,
who died August 12, 1927. It is the twelfth in the series of
accounts filed by the trustees but the first of the present
trustees, Thomas S. Burgin having succeeded Clarence
Burgin as a trustee on May 24, 1944. All previous accounts
have been allowed.

The evidence is reported and the judge has made a "vol-
untary report of the material facts" which appears to be
intended as a complete statement of all the material facts
upon which the decree is based. It will, therefore, be given
the same effect as a report under G. L. (Ter. Ed.) c. 215,
§ 11, as amended. *Turner* v. *Morson*, 316 Mass. 678, 680–
681.

The only item in the account which is in controversy is
a charge in schedule B of a loss to principal of $24,235.67
on three thousand seven hundred ninety-seven shares of
Meadow Brook Ice Company, hereinafter called Meadow
Brook. The findings of the judge in relation thereto are
substantially as follows. These shares, at the time of his
death, were owned by the testator who "practically" was
the sole owner of the company, a corporation engaged in
the natural ice business in Quincy. The shares were inven-
toried by the executors at $35,345.59 and in 1928 were trans-

ferred by them to the trustees and inventoried by the latter at the same valuation. Meadow Brook was not actively engaged in business but possessed as assets two ponds, a shed for storing ice, some unimproved land, and two hundred forty shares of Granite City Ice Company, hereinafter called Granite, a corporation actively engaged in the ice business in the same vicinity. It did not appear whether these shares represented a controlling interest in Granite. The property of Meadow Brook had been leased to Granite at a rental of $300 per month and the testator had agreed verbally that Meadow Brook, during the term of the lease, would not compete with Granite. Granite, under the lease, was required to pay Meadow Brook's taxes to the city of Quincy.

The original trustees, Burgin and Hall, were elected respectively president and treasurer of Meadow Brook, and the widow of the testator, Mercy L. Patch, its clerk. All three became directors of the corporation.

Burgin and Hall were also elected directors of Granite. The aforesaid lease or a renewal thereof expired in 1935 and Granite refused to renew it. Thereupon the two companies executed an agreement whereby Granite was to purchase all of the assets of Meadow Brook for a price of $55,000, $3,000 of which was to be paid down and the balance paid at the rate of $3,600 per year, together with municipal taxes. The stipulated payments totalling $40,800 were made until 1946 when Granite paid the amount then remaining due, $11,200, "in a lump sum" and received a deed and a transfer of the two hundred forty shares of its stock. Meadow Brook was dissolved in 1947. This $11,200, or more accurately a net sum of $11,109.92, was received by the trustees from Meadow Brook and invested in the securities stated in schedule C of the account. The loss of $24,235.67 shown in schedule B is derived by deducting this sum of $11,109.92 from the valuation of the Meadow Brook assets, $35,345.59, shown in the original trustees' inventory.

The explanation of this loss is found in the manner in which the trustees dealt with the $40,800 received on ac-

count of the purchase price previous to the final payment. For eleven and one third years Meadow Brook received $3,600 per year. By vote of the board of directors comprising the trustees and Mrs. Patch, she was paid this sum as an annual salary for serving as clerk of the corporation. Mrs. Patch had no actual duties to perform except to prepare and file "such corporation forms and returns that were necessary." These payments therefore were substantially gratuities. The reason that the trustees as directors of Meadow Brook authorized these payments was because of the provisions of the testator's will. The will provided that the trustees "shall pay out of . . . net income to my wife, Mercy L. Patch, during her natural life a sum of money which, with the income upon her own property, shall equal five thousand dollars per year . . . it being my desire and intention that my said wife shall have a total income of five thousand dollars per year during her natural life." This language was interpreted by this court in *Burgin* v. *Patch,* 312 Mass. 219, as giving authority to the trustees to take annually from principal enough to insure payments to the widow of $5,000 per year. Her individual income is not shown by the evidence but in no year did she receive in all more than $5,000.

From the beginning of the trust in 1928 to the end of the lease in 1935 the annual rentals of $3,600 received by Meadow Brook from Granite were, after small deductions for expenses, paid over to Mrs. Patch in the form of salary. How these payments were shown, if at all, in the trustees' accounts for that period does not appear. Essentially they were disbursements of income to which the trust was entitled.

After 1935, however, the payments of $3,600 made annually by Granite to Meadow Brook, when paid over by the latter, would have been received by the trustees on account of principal. When so received by the trustees, these sums could have been paid to the widow under the decision in *Burgin* v. *Patch,* provided that with her own individual income she did not receive more than $5,000 per annum.

If the trustees as directors of Meadow Brook had caused

to be distributed to themselves in the form of liquidating dividends the payments from Granite, their accounts would have reflected the gradual reduction in the value of their Meadow Brook shares and the receipt of compensating cash payments. By 1946 the trust would have been required to report not a loss but a gain.

Instead, the trustees caused the payments received from Granite to be paid directly to Mrs. Patch by Meadow Brook without passing through their hands as trustees. As the judge has found, "the method of accounting used by the trustees was irregular and subject to criticism." He found, however, that "they acted in good faith" and that the "remaindermen have not sustained any damage." In connection with the complaint of the respondents that Meadow Brook should have been dissolved at an earlier date, the judge also found as follows: "I find the trustees became directors in the Granite City Ice Company for the purpose of protecting the interests of the trust in the Meadow Brook Ice Company. I further find the trustees became officers and directors of the Meadow Brook Ice Company for the purpose of protecting the trust. There was no market for the capital stock of the Meadow Brook Ice Company." "I find the trustees used good judgment in keeping the Meadow Brook Ice Company alive, because its corporate existence kept its competitor, the Granite City Ice Company, renewing the lease until 1935, and it could be used as a trading proposition thereafter."

The findings of the judge were not plainly wrong. Technically the account as drawn shows a loss. We are of opinion that there was no error in its allowance and that nothing would be gained by remanding it to the Probate Court to be recast. See *Lannin* v. *Buckley*, 256 Mass. 78, 82–83.

*Decree affirmed.*